**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| _____ x | | |
| In re: | : | Chapter 11 |
| | : | |
| AFFINITY HEALTH CARE | : | Case No.  08-22175 (ASD) |
| MANAGEMENT, INC., *et al*,[1] | : | |
| | : | (Jointly Administered) |
| Debtors | : | |
| _____ x | | April 28, 2010 |

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT PLAN OF
REORGANIZATION FOR AFFINITY HEALTH CARE MANAGEMENT, INC.,
HEALTH CARE INVESTORS, INC., HEALTH CARE ALLIANCE, INC.,
HEALTH CARE ASSURANCE, LLC AND HEALTH CARE RELIANCE, LLC**

## I.     INTRODUCTION

Affinity Health Care Management, Inc. ("Affinity") Health Care Investors, Inc.

d/b/a Alexandria Manor ("Alexandria"), Health Care Alliance, Inc. d/b/a Blair Manor

("Blair"), Health Care Assurance, LLC d/b/a Douglas Manor ("Douglas") and Health

Care Reliance, LLC d/b/a Ellis Manor ("Ellis") (Ellis, collectively, with Alexandria, Blair

and Douglas, the "Providers" ; and, the Providers, together with Affinity are hereinafter

collectively referred to as the "Debtors"), have proposed and filed their Second

---

[1]   Affinity Health Care Management, Inc., Case No. 08-22175, Health Care Investors, Inc. d/b/a
Alexandria Manor, Case No. 08-22177, Health Care Alliance, Inc. d/b/a Blair Manor, Case No. 08-
22178, Health Care Assurance, L.L.C. d/b/a Douglas Manor, Case No. 08-22179, and Health Care
Reliance, L.L.C. d/b/a Ellis Manor, Case No. 08-22180.

Amended Joint Plan of Reorganization dated April 28, 2010 (the "Plan") with the United States bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"). A copy of the Plan is annexed hereto as Exhibit A.  The Debtors hereby submit this Second Amended Disclosure Statement dated April 28, 2010 (the "Disclosure Statement") pursuant to §1125 of the Bankruptcy Code (the "Code") in connection with solicitation of acceptances or rejections of the Plan from holders of claims against and interests in the Debtors.  The hearing on confirmation of the Plan is scheduled for May 12, 2010, at 2:00 P.M.  By order of the Bankruptcy Court dated April 28, 2010, this Disclosure Statement has been approved as containing "adequate information" for creditors and equity security holders of the Debtor in accordance with §1125(b) of the Code.  Approval of this Disclosure Statement by the Bankruptcy Court does not indicate that the Bankruptcy Court recommends either acceptance or rejection of the Plan.

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  NO REPRESENTATIONS CONCERNING THE DEBTORS, INCLUDING THOSE RELATING TO ITS BUSINESS OPERATIONS, OR THE VALUE OF ITS ASSETS, ITS PROPERTY AND CREDITORS' CLAIMS INCONSISTENT WITH ANYTHING CONTAINED HEREIN, HAVE BEEN AUTHORIZED.  ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE

OR REJECTION OF THE PLAN THAT IS OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE OR WITHOUT OMISSIONS. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION BY THE BANKRUPTCY COURT FOR OR AGAINST ANY FILED PLAN. NOTWITHSTANDING THE FOREGOING, THE DEBTORS HAVE USED ITS BEST EFFORTS TO HAVE ALL THE INFORMATION CONTAINED HEREIN BE TRUTHFUL AND ACCURATE AND, TO THE BEST OF DEBTORS' KNOWLEDGE, SUCH INFORMATION IS TRUTHFUL AND ACCURATE.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON HOLDERS OF CLAIMS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED

HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THIS DISCLOSURE STATEMENT SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT AND SINCE THE DATE THAT THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

Accompanying the Disclosure Statement are copies of:

(a)     the Plan;

(b)     the Order Scheduling Expedited Hearing on Plan Confirmation and Shortening the Objection and Balloting Deadline in connection therewith;

(c)     the Notice fixing (i) that the time for submitting acceptances or rejections of the Plan; (ii) the date and time of the hearing to consider confirmation of the Plan and related matters; (iii) the time for filing objections to the Plan (the "Confirmation Hearing Notice"); and

(d)     ballots for acceptance or rejection of the Plan.

Pursuant to provisions of the Code, only classes of Claims and Interests that are "impaired" under the terms and provisions of the Plan, may vote to accept or reject the Plan. For purposes of the Plan, only the voting classes are deemed to be

impaired.   ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO MEMBERS OF THE VOTING CLASSES.

Each holder of a Claim or Interest in a voting class should read this Disclosure Statement, together with its exhibits, in their entirety.  After carefully reviewing the Plan and its exhibits, and this Disclosure Statement and its exhibits, please indicate your vote on the Plan on the enclosed ballot and return it in the envelope provided.  If you have an impaired Claim or Interest in more than one class, you will receive a separate coded ballot for each Claim.  See I.A. "Voting Instructions".  **PLEASE VOTE EVERY BALLOT YOU RECEIVE.**

For a summary description of the treatment of each Class of Claims and Interest and the estimated value of distributions to each class of claims in interest as provided in the Plan, see I.C. "Overview of the Plan".

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for May 12, 2010 at 2:00 P.M. at the United States Bankruptcy Court, 450 Main Street, Courtroom 715B, 7th Floor, Hartford, Connecticut, (the "Confirmation Hearing"), the Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before May 10, 2010**,** in the manner described in the Confirmation Hearing Notice accompanying this Disclosure Statement.  The Court will

consider only objections that are properly filed and served by the deadline.  The day of the Confirmation Hearing may be adjourned from time to time without further notice.

**BOTH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE") AND THE DEBTORS URGE ALL CREDITORS TO VOTE IN FAVOR OF THIS PLAN BECAUSE IT PROVIDES THE GREATEST POSSIBLE RECOVERIES TO CREDITORS.   YOUR "YES" VOTE ON THE ENCLOSED BALLOT IS RECOMMENDED FOR THE FOLLOWING REASONS:**

The Debtors and the Committee believe that the failure to confirm the Plan would result in cessation of operations and liquidation of the Debtors' businesses.  In the event of a liquidation, the Debtors would have insufficient funds to pay in full the claims of Creditors asserting administrative expense claims and no money to pay general unsecured claims.  Failure to confirm the Plan will also reinstate any and all prepetition recoupment claims of the State, which are being addressed and resolved through the Plan.  The Plan allows Creditors to participate in distributions in excess of those that would be available if the Debtors were liquidated under Chapter 7 of the Code.

Capitalized terms used in this Disclosure Statement and not defined herein shall have the respective meanings assigned to them in the Plan.

A.    **Voting Instructions**

1.    Ballots

In voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement.  If you have an impaired claim in more than one Class under the Plan, you will receive multiple ballots.  IF YOU RECEIVE MORE THAN ONE BALLOT, YOU SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM OR INTEREST AND YOU SHOULD COMPLETE AND RETURN ALL OF THEM.

IF YOU ARE A MEMBER OF A VOTING CLASS AND DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, CALL THE DEBTOR'S COUNSEL, PULLMAN & COMLEY, LLC AT 203-330-2228, ATTENTION:   Carol McConnell.

2.    Returning Ballots

YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE TO PULLMAN & COMLEY, LLC, 850 MAIN STREET, P.O. BOX 7006, BRIDGEPORT, CT 06601-7006 – ATTENTION: ELIZABETH J. AUSTIN IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED ON OR BEFORE May 10, 2010.

B.     <u>Acceptance or Rejection of the Plan</u>

As a creditor of the Debtors, your vote on the Plan is most important.  In order

for the Plan to be accepted by Creditors, votes representing at least two-thirds (2/3) in

amount and more than one-half (1/2) in number of claims allowed for voting purposes

of each impaired class that are voted must be received for the acceptance of the Plan.

The Debtor is soliciting acceptances from members of the following Classes of Claims:

Class 2 (Secured Claim of HCI); Class 4 (Secured Claim of DSS); Class 5 (Secured

Claim of GMAC), Class 6 (Secured Claim of Great American); Class 7 (Holders of

General Unsecured Claims) and Class 8 (Equity Interests).  Class 1 Claims (Priority

Tax Claims) and Class 3 (Secured Claim of DRS) are not impaired and do not vote.

C.     <u>Overview of the Plan</u>

THE DESCRIPTION SET FORTH BELOW CONSTITUTES A SUMMARY

ONLY.  CREDITORS ARE URGED TO REVIEW THE MORE DETAILED

DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT.

SEE III "PLAN OF REORGANIZATION" BELOW AND THE PLAN ITSELF, WHICH IS

INCLUDED AS **EXHIBIT A** TO THIS DISCLOSURE STATEMENT.  ALL SUMMARIES

ARE QUALIFIED BY THE PLAN ITSELF.  THE PLAN IS CONTROLLING IN THE ANY

EVENT OF ANY INCONSISTENCY BETWEEN A SUMMARY AND THE PLAN.

The material provisions of the Plan are the product of extensive negotiations between the Debtors, the entities which own the property where the Providers are located consisting of Alexandria Manor Associates, LLC, Blair Manor, LLC, Assurance Healthcare Associates, LLC, and Reliance Healthcare Associates, LLC (the "Real Estate Entities"), the United States of America Department of Housing and Urban Development ("HUD"), the United States Internal Revenue Service (the "IRS") and the State of Connecticut (the "State"), Metro Exchange, LLC ("Metro") and the Creditor's Committee.  As a result of the negotiations, the Debtors and the Real Estate Entities have entered into a settlement with HUD (the "HUD Settlement") and the Debtors entered into settlements with the IRS and Metro (the "Metro/IRS Settlement") and the State (the "State Settlement"). While all of the settlements were independent from one another, the State, HUD and the IRS agreed to support a Plan of Reorganization only if the Debtors and the Real Estate Entities were successful in negotiating the terms of a restructuring of the mortgages held by HUD on the real property owned by the Real Estate Entities and the settlement with the IRS.  The detailed terms of the HUD Settlement, the Metro/IRS Settlement and the State Settlement are contained in agreements, which have been approved or will be approved and implemented through the Plan confirmation process, and are appended to the Plan as Exhibits "1, 2 and 3."

Another material provision of this Plan involves conversion of the Post-Petition Funding Facility (variously, the "DIP Funding Facility") provided to the Providers by Health Capital Receivables Administrative Corporation, a New York corporation ("HCI"), assignee of Health Capital Receivables Funding Special Purpose Corporation I, a New York corporation ("HCRFSPC"), as such Post-Petition Funding Facility was approved by Bankruptcy Court Order entered November 20, 2009 (as such an order was amended, in minor respects, by further order dated December 30, 2009) and thereafter amended, from time to time, which facility will be converted into an Exit Funding Facility upon confirmation of the Plan and occurrence of the Effective Date of the Plan.

Under the terms of the Non-Recourse Health Care Accounts Receivable Purchase Agreement (the "Purchase Agreement") and related funding documents by and between the Providers and HCRFSPC dated November 18, 2009, as thereafter amended from time to time to, among other things, extend the date of the debtor-in-possession funding commitment from its original 90 days and to reflect the assignment by HCRFSPC of its rights as Purchaser to HCI, and its related documents and instruments (together, the "Post-Petition Funding Facility"), as approved by the Bankruptcy Court on November 20, 2009 (as amended, in minor respects, by further Order dated December 30, 2009), on November 23, 2009, and thereafter, the

Providers sold substantially all of their accounts and related books, records and other Conveyed Property to HCRFSPC (and later HCI) in a "true sale", with HCRFSPC (and later HCI, its assignee) taking a first priority security interest in such assets as buyer thereof.  The Providers received an advance of approximately 80% of the purchase price of the subject accounts from the factor on November 23, 2009, as a partial pre-payment of HCI's purchase price.  Thereafter, the Providers have continued to sell substantially all their accounts and related books, records and other Conveyed Property to the factor on a weekly-basis receiving, as also with the initial "batch" of accounts sold to the factor on November 23, 2009, an initial 80% initial advance from the factor.  As each "batch" of accounts sold to the factor closes, upon all accounts in the particular batch being collected, charged-back or otherwise credited, the factor thereupon credits a balance payment to the Providers equal to the purchase price of subject accounts in the batch less unpaid discount fees and any other costs and expenses then due to the factor by the Providers.

Under the Post-Petition Funding Facility, the factor also receives a first priority security interest, as lender, in Non-Purchased Accounts (all accounts not sold to the factor, such as self-pay accounts), in credit balances owed by the factor to the Providers in respect of accounts sold to the factor, and in substantially all other assets of the Debtors, as security for obligations and indebtedness of the Providers to the

factor under the Post-Petition Funding Facility arising from unsatisfied charge-backs, and discount fees and other costs and expenses due and owing by the Providers to the factor.

The Providers' receipt of the initial funding under the Post-Petition Funding Facility on November 23, 2009 enabled the Debtors to implement the Metro/IRS Settlement which resulted in the Secured Claims of the IRS and Metro being satisfied in full, and HCRFSPC's initial funding also provided monies that partially funded the Settlement with the State.  As noted above, under the Plan, the Post-Petition Funding Facility between HCI and the Debtors will be replaced with an Exit Funding Facility between HCI and the Reorganized Debtors upon their emergence from Chapter 11. The proposed Ratification, Assumption and Amendment Agreement between the Providers, Affinity (who acts as a validity guarantor of the Providers' obligations to HCI, as assignee of HCRFSPC), and HCI is attached to the Plan as Exhibit 4[2].

The implementation of the Settlements described herein and in the Plan, the conversion of the Post-Petition Funding Facility into an Exit Funding Facility and the contribution of new money by Equity, will allow the Debtors to emerge from bankruptcy and implement the Plan.  The Plan is a five-year plan and proposes to pay Unsecured

---

[2]   The draft document is attached to the Plan and the final document reflecting further changes, if any, will be filed in a Plan Supplement prior to confirmation.

Creditors in equal quarterly installments through the term of the Plan, approximately ten percent (10%) of Allowed Unsecured Claims.

### D.    Deemed Consolidation for Distribution Purposes

For the purposes of distributions under the Plan, the Debtors will be considered to be a single legal entity.   The only significant affect of this consolidation is that Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims and unsecured claims will be considered to be single claims against the Consolidated Debtors.  The deemed consolidation will not affect the legal and organizational structure of the Debtors, the conversion of the Post-Petition Funding Facility into the Exit Funding Facility or the Ratification Assumption and Amendment Agreement executed by the Reorganized Debtors in connection with same or guarantees or grants of collateral in connection with any financing entered into on the Effective Date or pursuant to any contract or lease that is assumed under the Plan.   The foregoing deemed consolidation of the Debtors will result in deemed elimination of multiple and duplicative claims, joint and several liability claims and guarantees the payment of Allowed Claims against the Debtors from a common fund.

Debtors believe that the foregoing deemed consolidation of their respective estates is warranted in light of the criteria established by the courts in ruling on the propriety of such consolidation in other cases.   Two critical factors considered in

assessing the entitlement to subsequent consolidation are (i) whether the creditors dealt with the debtors as a single, economic unit and did not rely upon their separate identity in extending credit or (ii) whether the affairs of the debtors are so entangled consolidation will benefit all creditors.

With respect to the first factor, creditors who make loans on the basis of financial status of a separate entity expect to be able to look to the assets of the particular borrower for satisfaction of that loan. The second factor involves whether there has been a comingling of assets and business functions and considers whether all creditors will benefit because untangling is either impossible or so costly as to consume the assets. The following is a discussion of these factors as they relate to the Debtors.

There is ample factual basis for the deemed consolidation of the Debtors. First, the funding of the Post-Petition Funding Facility dealt with all of the Debtors as a single economic unit and did not rely in their separate identity in extending credit. Specifically, the Operating Entities jointly and severally, individually and collectively, are treated as one "seller" of accounts to HCI, and the management company Affinity is a guarantor of the obligations under the Post-Petition Funding Facility, and other financial accommodations. The Debtors will continue to be sellers and/or guarantors under the Exit Funding Facility.

Second, the affairs of the Debtors are entangled to the extent that consolidation will benefit all creditors.  The Debtors consist of a management company and four skilled nursing facilities all located in close proximity in the State of Connecticut.  All four of the skilled nursing facilities are managed by Affinity, the Debtor management company.  The Debtors utilize a unified cash management system which would make it extremely difficult to confirm a plan of reorganization for individual debtors.

Third, the books and records of the Debtors reflect a substantial amount of intercreditor claims which are being waived pursuant to the Plan.

Fourth, the funding being provided through the HUD settlement are contingent upon all four of the operating entities emerging from Chapter 11.  In light of the fact that certain of the operating entities are financially stronger than others, the inability to consolidate for the purposes of distribution put the ability of certain of the Debtors to reorganize at risk.

Finally, the deemed consolidation substantially reduces the costs involved with the confirmation process, all of which benefits the creditors.

In view of the foregoing, the Debtors believe that the creditors will not be prejudiced by the deemed consolidation proposed in the Plan.  Further, the Debtors believe that the deemed consolidation will best utilize the Debtors' assets and

maximize the potential of all debtors to pay creditors of each entity the Distributions proposed in the Plan.

### E.     Background and General Information

Affinity is a management company responsible for the operations of Alexandria, Blair, Ellis and Douglas, four skilled nursing facilities located in the State of Connecticut.  Up until October 1, 2008, Affinity was also responsible for the operations of HealthCare Ventures, Inc., d/b/a Crescent Manor ("Crescent"), a 129 bed skilled nursing facility, at which time Crescent was placed into receivership.

From its inception in 1992 and continuing through the present, Affinity has been dedicated to improving patient care.  This was accomplished by its "hands-on" management style as well as the rehabilitation and renovation of the existing buildings. All of the aforementioned facilities prior to the involvement of Affinity were in deplorable condition.  Three of the properties required the construction of new buildings in addition to renovations of the existing structures.  The new construction and renovations were all done in accordance with the specific requirements of the State of Connecticut, Department of Health, and in conjunction with the State of Connecticut, Department of Social Services.  Today these facilities, which had been providing sub-standard care and unacceptable living conditions, are now providing the best patient care in new spacious accommodations.

F.    **Events leading up to the Bankruptcy**

On July 26, 2006 the Debtors jointly and severally borrowed $2,250,000 from Metro.  As collateral for repayment of the loan and any additional sums owed, Metro received a security interest in, and a lien on all of the Debtors' account receivables, contract rights and the proceeds thereof.   In addition, an affiliate, Crescent manor, which is no longer operating, is presently in receivership, was also a maker on the loan and pledged the same collateral as the Debtors.  Metro perfected their liens on the Debtors' personal property by filing the requisite Uniform Commercial Code Statements.  By reason of increasing costs, increasing Medicaid recoupments and the above-market rent the Debtors were obligated to pay, the Debtors were unable to stay current on their obligations to Metro.

Additionally, by reason of the foregoing, the Debtors fell behind on their obligations to the IRS.  Prior to the Debtors' Chapter 11 filings, the Debtors did not pay approximately $1,700,000 of taxes to the IRS.  On July 17, 2008, the IRS filed tax liens for approximately $1,435,000.   Their tax liens attached to all assets of the Debtors including "cash collateral".  Under Internal Revenue Code Sections 6321 and 6323 on the forty-six day (September 1, 2008) after its tax lien was filed, the IRS lien primed the lien of Metro on any receivables of the Debtors created after August 31, 2008.  As

such, the IRS asserted that Metro's secured claim was subordinate to the IRS lien on certain of the Debtors' receivables, which Metro disputed.

## II.    THE CHAPTER 11 CASE AND SETTLEMENTS

On October 14, 2008, the Debtors filed a voluntary petition seeking the relief afforded by Chapter 11 of Title 11, United States Bankruptcy Code, §§ 101 et seq., in the United States Bankruptcy Court, Southern District of New York.   In accordance with § 1107 and § 1108 of the Bankruptcy Code, the Debtor was authorized to continue in possession of its properties and operate and manage its business as debtor-in possession.   On October 30, 2008 an order entered transferring venue to the United States Bankruptcy Court, District of Connecticut.   No trustee or examiner has been appointed.

### A.    The Debtor's Professionals

The Debtors retained the Law Firm of Hofheimer, Gartlir and Gross, LLP to represent the Debtors in Connection with the Chapter 11 proceedings.   Subsequently, Pullman & Comley, LLC was retained to represent the Debtors as local counsel after the Cases were transferred to the District of Connecticut.   The Bankruptcy Court approved the appointment of Hofheimer, Gartlir and Gross, LLP ("HGG") on December 5, 2008, and the appointment of P&C on December 16, 2008.

Thereafter, HGG was replaced by Eiseman, Levine, Lehrhaupt & Kakoyannis ("ELLK") to act as lead counsel for the Debtors.   The substitution of ELLK was approved by the Bankruptcy Court on January 14, 2009.   On April 7, 2009, the services of ELLK were terminated by the Debtors, and P&C took over the role of lead counsel.

The Debtors also retained additional professionals to assist them in connection with the Chapter 11 proceedings.    Such professionals included Genovese & Wonneberger, accountants to the Debtors, whose employment was approved by the Bankruptcy Court by Order dated February 24, 2009; Fred Dalicandro as financial advisor to the Debtors, whose appointment was approved by the Bankruptcy Court by Order dated December 24, 2008; Metzger, Lippe, Goldstein & Brightstone as special labor counsel, whose employment was approved by the Bankruptcy Court by Order dated February 20, 2009; and Hertzmark, Crean & Lahey, LLP as collection counsel, whose employment was approved by the Bankruptcy Court by order dated April 14, 2009.

**B.**      **Formation of Creditors Committee and Selection of Professionals**

On November 4, 2008, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") comprised of Value Health Care Services, LLC, Healthcare Services Group, Inc., Duso Food Distributors,

Inc., Foremost Rehab, LLC, The Connecticut Light & Power Company, New England Health Care Employees Pension Fund, and AETNA.   The Committee retained Neubert, Pepe & Monteith ("Neubert") as its attorneys to advise and represent the Committee in connection with these proceedings.   By Order dated December 18, 2008, the Bankruptcy Court approved the employment of Neubert.   On or about November 12, 2008, the Committee retained Blum Shapiro & Co., P.C. ("Blum Shapiro") as its Accountants.   By Order dated December 18, 2008, the Bankruptcy Court approved the Committee's employment of Blum Shapiro.

        **C.**        **Events During The Chapter 11 Case**

The Debtors commenced their Chapter 11 cases to restructure their operations and to insure their long-term viability through a plan of reorganization subject to Court approval.

As of the filing, the liens of Metro and the IRS attached to the Debtors' cash collateral which was composed of proceeds in cash from the collection of receivables and the receivables which the Debtors would collect in the future.   Through consensual cash collateral orders, the Debtors were permitted to utilize the cash collateral in which Metro and the IRS held and interest, and in exchange made adequate protection payments to Metro and the IRS.

Since the Petition Date, the Debtors have implemented staffing reductions and consolidations resulting in approximately $600,000 of annual savings.  The Debtors have also restructured or renegotiated contracts with vendors and service providers which when fully implemented are expected to result in approximately $300,000 of additional annual savings.  The Debtors have worked diligently to improve census and have successfully increased occupancy, while maintaining the highest level of care for their residents.

However, the staffing reductions and other cost-cutting measures that have been taken by the Debtors during the Reorganization Proceedings, were not enough in order for the Debtors to emerge from Chapter 11 and confirm a Plan.  It was necessary for the Debtors to resolve the issues of the State, HUD, the IRS, and Metro, all of which has been accomplished, as set forth in more detail below.

Since the early part of 2009, the Debtors began negotiating with HUD, the State and the IRS for the purposes of working out a consensual exit strategy, which is set forth in the Settlements described below.  Additionally, after reaching agreements with the State, the IRS and HUD regarding the parameters of the Settlements, the Debtors began negotiating with Metro, which resulted in the settlement with Metro described below.

On November 20, 2009, the Court approved the Post-Petition Funding Facility. The Debtors and HCI have subsequently come to terms on a Ratification, Assumption and Amendment Agreement and related Letter of Intent under which the Post-Petition Funding Facility will be converted into an Exit Funding Facility with the Reorganized Debtors becoming parties to the Purchase Agreement and agreeing to assume the obligations and duties of the Debtors thereunder, with accounts and related Conveyed Property to continue to be sold to HCI by the Reorganized Debtors, from and after the Effective Date of the Plan, with HCI taking a first lien, as buyer, in such accounts and related Conveyed Property, and HCi also taking a first lien, as lender, in the Non-Purchased Accounts, credit balances in all other assets of the Reorganized Debtors. The terms of the Exit Funding Facility, which, in large part, continues the terms and conditions of the Post Petition Funding Facility, are more fully described in the proposed Ratification, Assumption and Amendment Agreement attached to the Plan as Exhibit 4 and in the Debtor's Motion For Order Under Sections 105, 363(b), 1129 And 1142 of the Bankruptcy Code And Fed. R. Bankr. P. 2002. 6004, 9006 and 9007, In Aid Of Confirmation, Authorizing The Debtors To Enter Into Certain Agreements In Connection With An Anticipated Exit Funding Facility And For Authority to Incur And Pay Fees And Costs In Connection Therewith (the "Exit Funding Facility Motion.")

### D.    Bar Date for Administrative Claims

On December 21, 2009, the Debtors filed a Motion requesting the Bankruptcy Court to fix a Bar Date by which holders of Administrative Claims other than Professionals must file their Administrative Expense Claims. The Bankruptcy Court heard the Motion on January 5, 2010, and set February 8, 2010 as the Administrative Claims Bar Date.

### E.    Metro/IRS Settlement

On November 20, 2009, the Bankruptcy Court approved the Metro/IRS Settlement.  Under the terms of the Metro/IRS Settlement, Metro was paid a total of $1.5 million, and in exchange for same, Metro released any and all liens it held on the assets of the Debtors, and additionally, released the principals of the Debtors from a Judgment that had been obtained against the principals in connection with their Guaranty of the Metro debt, so that the principals could provide the required guaranties in connection with the Post-Petition Funding Facility.  The Post-Petition Funding Facility, which was also approved on November 20, 2009 by the Bankruptcy Court, provided the mechanism for the payment of the $1.5 million to Metro. Additionally, the Metro/IRS Settlement provides that Metro retain a claim of $50,000, to be paid in full, but without interest in twelve equal monthly installments commencing on April 1, 2010.  However, due to the delay finalizing the settlement with HUD which

led to a delay in the plan confirmation process, the payment due dates as provided in

the Metro/IRS Settlement has been extended by three months.

      **F.**      <u>**Settlement With HUD**</u>

      HUD holds the mortgages against the properties owned by the Real Estate

Entities (the "Mortgages").   At least two of the Mortgages have interest rates

substantially higher than current market rates.   The only source of revenues to pay the

amounts due on the Mortgages has been the rent paid by the Debtors to the Real

Estate Entities.   The Debtors were paying a total of $370,000 per month under the

leases with the Real Estate Entities.   The Debtors simply did not have sufficient cash

flows to pay the high rents.   The Debtors fell behind on their rent payments which

resulted in the Real Estate Entities defaulting on the Mortgages.   As of the Petition

Date, the Real Estate Entities were in arrears in the approximate amount of $1 million

for pre-petition rents due.   In order to reduce the rent, the Mortgages need to be

restructured to reduce the Mortgage Payments.   The Debtors requested certain

concessions from HUD with regard to the Mortgages in order to reduce their monthly

rental payments.   The request to HUD includes a reduction in mortgage interest rates

to current market rates and reduction in principal and/or repayment terms.   After

months of negotiations, the Debtors and the Real Estate Entities have come to terms

of a settlement with HUD, which will not only result in a substantial savings to the

Debtors by reason of a reduction in rent, but will also generate funds which will be available to the Debtors for implementation of the Plan and operations, by reason of secured and unsecured financing to be provided by HHF and insured, in part, by HUD. Pursuant to the HUD Settlement, HHF will loan $450,000 to Benjamin Z. Fischman to be secured by his and Samuel Strasser's interest in three of the properties owned by the Real Estate Entities, being Property A, Property B and Property D.   HUD will continue to hold the mortgage on the fourth property, Property E, but will restructure the mortgage to reduce the interest rate to 5 1/2 %, of which 2% will be devoted to curing the existing mortgage arrearage on said mortgage.

The restructured mortgages will allow for a reduction in the monthly rental payments made by the Debtors to the Real Estate Entities, which results in an annual savings to the Debtors of approximately $850,000.   In addition, HHF will make an Operating Loss Loan to Property A in the amount of $1,250,000, which will be insured by HUD under the provisions of Section 232, pursuant to Section 223(d)(3) of the National Housing Act, and the Regulations now in effect thereunder.   The proceeds of the HHF Loan and the Operating Loss Loan will be utilized to cure the mortgage arrearages on Property A, Property B and Property D, as well as pay other fees necessary to enable the mortgages on those subject properties to be restated, reassigned and restructured.   There will be approximately $300,000 remaining from

the proceeds of the HHF Loan and the Operating Loss Loan after paying the aforesaid cure amounts and fees, which will be loaned by Benjamin Z. Fischman and Property A to the Debtors for use in operations.

The terms of the settlement between HUD, the Debtors and the Real Estate Entities is described in more detail in the Settlement Agreement is appended to the Plan. The HUD Office of Insured Health Care Facility has preliminarily approved the HUD Settlement Agreement and it has been forwarded with a positive recommendation for final approval by the Commissioner. The closing is a condition to the occurrence of the Effective Date of the Plan.

### G.    Settlement With State of Connecticut

The State of Connecticut (the "State") asserts that as of the Petition Date, the State asserts a Medicaid Recoupment Claim in the amount of $3,998,948 against the Debtors, which the Debtors dispute. After months of negotiation, the State and the Debtors reached an agreement which provided for the State agreeing to waive its Prepetition Recoupment Claim in exchange for the payment by the Debtors through the Plan of Provider Tax Obligations, Pension Fund Obligations, additional cash payments and the implementation of financial controls, as well as the withdrawal of the Adversary proceeding commenced by Affinity against the State relating to a dispute with respect to recoupment rights. The terms of the settlement between the State and

the Debtors is described in detail in the Settlement Agreement is appended to the Plan.

### H.    Settlement With IRS

On November 20, 2009, the Court approved the Metro/IRS Settlement and the Debtors entry into the Post-Petition Funding Facility, the initial funding proceeds of which, received November 23, 2009, together with the settlement enabled the Debtor to pay off the IRS's Secured Claim.  Further, pursuant to the Metro/IRS Settlement, the Debtors have agreed to pay in full an additional $100,000 to the IRS, which amount will be added to the Priority Non-Tax Claim of the IRS, and paid through the Plan over a five-year period, with interest at six percent (6%).  The Debtors' agreement with the IRS has been approved by the Court, which settlement will be incorporated into the Plan.  A copy of the Metro/IRS Settlement Agreement is appended to the Plan. However, due to the delay in finalizing the settlement with HUD which led to a delay in the Plan Confirmation process, the payment due provided therein has been extended by three months.

### I.    Post-Confirmation Management

As of the Effective Date and in accordance with the terms of the State Settlement and the HUD Settlement as more fully described herein, the Debtors will retain Genovese and Wonneberger, LLC ("G&W" or "Financial Manager") as its chief

financial officer for the Reorganized Debtors.  G&W will be compensated at the rate of $117,000 per annum and will perform all of the duties as outlined in the State Settlement and HUD Settlement, as more fully described herein.  G&W have served as the Debtors' outside accountant and financial advisor throughout the reorganization proceedings and has been actively involved in assisting with the administration of the cases.   During the post-petition period, G&W have been directly involved in the operational and financial systems in the companies and have facilitated the Debtors with respect to the post-petition cost saving measures taken as more fully described herein.   For these reasons, G&W have detailed knowledge of the companies' operations and have established rapport with DSS, HUD, HCI and HHF, as well as with the owners and senior management and have gained insight and understanding of the major issues fundamental to the success of the Plan.

The initial term of the Financial Manager's Contract will be five (5) years, provided however that after (3) years, with the State's participation, the Debtors will conduct a performance review of the Financial Manager to insure that the Financial Manager is fulfilling his or her duties, and if not, the Debtors, with the State's approval, will take the appropriate steps to address the same including, if necessary, a termination for cause, at which time a new Financial Manager will be selected subject to the approval of the State and HUD.

At the end of the five-year term, the Financial Manager's Contract will either be renewed for an additional five years, subject to the consent and approval of HUD and the State, or such Financial Manager will be replaced with a new Financial Manager, who will serve pursuant to a new five-year contract, subject to the approval of HUD and the State.  The initial five-year term will commence on the Effective Date.  The Financial Manager position will be funded through salary reductions on the existing management and reductions in existing management staff, and will not increase the current costs for management at the Facilities.  The Financial Manager's duties and responsibilities will include insuring adherence to the Plan, preserving the overall integrity of the Debtors, responsibility for interacting with DSS on all of their issues, reviewing cash disbursements and insuring that rent, payroll, payroll taxes, provider taxes, employee and Union pension and benefit payments and vendor payments for goods and services are made timely, meeting with Facility Administrators, Management Company personnel and other appropriate Facility personnel to review operations, as well as working with the Debtors' outside accountant to review and monitor all Operating Budgets, monthly closings, review of monthly results, preparation of tax returns and cost reports, as well as working with the outside accountant with regard to the operations of the Real Estate Entities including preparation of year-end

financial statements for the required annual audits, as well as compliance with all aspects of the HUD Regulatory Agreements.

Benjamin Fischman is the Debtors' President and Chief Executive Officer, and Sam Strasser is the Debtors' Vice President of Operations.   The salary of Mr. Fischman will be reduced to $220,000 per year, the salary of Mr. Strasser shall be reduced to $145,000 per year, and the personal business expenses, inclusive of insurance and/or pension benefits, shall be capped at $50,000.   Said salaries will remain in effect for a two (2) year period, at which time the Chief Financial Manager will review same for the purposes of determining whether there should be an adjustment.   Mr. Fischman and Mr. Strasser are well regarded for their roles in the highest quality of patient care as well as their critical rolls in maintaining a solid relationship between labor and management.    Accordingly, their continued involvement in these areas is considered critical to maintaining census and employee stability.   Mr. Fischman is a law school graduate and has been in the nursing home business for over 15 years.   In the past, his responsibilities at the homes included overseeing all operational and financial aspects of running the nursing homes.   Mr. Strasser has been in the nursing home business for over 20 years.   His responsibilities have included supervising vendor relations, all administrative activities and reviewing all clinical procedures.

## III.   THE JOINT PLAN OF REORGANIZATION

The Debtors believe that under the Plan, holders with allowed claims against the Debtors will obtain recoveries from the estates of the Debtors having a value in excess of what otherwise would be available if the assets of the Debtors were liquidated pursuant to Chapter 7 of the Code.   Through a reorganization of the Businesses as going concerns, the Debtors will have sufficient assets to pay its liabilities, and confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor.

The Debtors believe that the foregoing classification of Claims and Interests will permit all Claimants to obtain a fair distribution under the Plan and will accommodate the needs and particular attributes of the different types of Claims and Interests in these Chapter 11 cases.   The classification results in the highest value being made available to all creditors.   A description of each of the classes of Claims and Interests and their respective treatment under the Plan is set forth below.

THE FOLLOWING IS A SUMMARY OF THE SIGNIFICANT ELEMENTS OF THE PLAN.   THE DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE ATTACHMENTS THERETO.

**A.      Classification**

As discussed more briefly above, the Plan provides for the division of holders of claims of interest into the following classes:

<u>Priority Non-Tax Claims</u> – Allowed Priority Non-Tax Claim.

(a)     Class 1 – Priority Non-Tax Claim.

<u>Secured Claims</u> – Claims that are secured by a lien or encumbrance on a property of the Debtors are classified as follows:

(a)     Class 2 – Secured Claim of HCI

(b)     Class 3 – Secured Claim of DRS

(c)     Class 4 – Secured Claim of DSS

(d)     Class 5 – Secured Claim of GMAC

(e)     Class 6 – Secured Claim of Great American

<u>Unsecured Claims</u> – Unsecured Claims are classified as follows:

(a)     Class 7 – General Unsecured Claims

<u>The Common Stock Interests</u> - Equity interests are classified as follows:

(a)     Class 8 – Interests of the Holders of Debtor's Common Stock.

**B.**    **Treatment of Claims and Interest.**

**1.**    **Priority Tax Claims**  Priority Tax claims are Unimpaired and do not vote on the Plan. Each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, release and discharge of such Claim the amount of such Allowed Priority Tax Claim in Cash as follows as agreed to by the Debtor and the Holders of the Allowed Priority Tax Claim.

(a)    **Unsecured Priority Tax Claim of the IRS.**  The IRS holds an Unsecured Priority Claim in the total amount of $335,707.71, which claim will be paid in equal quarterly installments commencing on July 31, 2010 and continuing each quarter thereafter for a period of five (5) years, plus statutory interest at 6% per annum.  This amount includes the additional $100,000 agreed to be paid as a condition of the IRS/Metro Settlement.

(b)    **Unsecured Priority Tax Claim of the State of Connecticut Department of Labor.**  As of the As of the Petition Date, the State of Connecticut Department of Labor holds an Unsecured Priority Claim for Employer Unemployment Taxes, in the amount of $51,170.10, which claim will be paid in equal quarterly installments commencing on July 31, 2010, and continuing each

quarter thereafter until December 31, 2013, plus statutory interest at 12% per annum.

(c)  **Unsecured Priority Claim of the State for Nonprovider Taxes.**
As of the Petition Date, the State holds an Unsecured Priority Claim for Nonprovider Taxes, in the amount of $399,064.20, consisting of $380,448.15 in principal and $18,616.05 in interest, which claim will be paid in equal quarterly installments commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years, plus statutory interest at 12% per annum.

(d)  **Unsecured Priority Tax Claim of the State of Connecticut Department of Labor.**  As of the Petition Date, the State of Connecticut Department of Labor held an unsecured priority claim for unemployment compensation employer tax in the amount of $51,170.10, which claim will be paid in equal quarterly installments commencing on July 31, 2010 and continuing each quarter until December 31, 2013, plus statutory interest at 12% per annum.

(e)    **Unsecured Priority Tax Claim of the City of Hartford.**  As of the Petition Date, the City of Hartford held an Unsecured Priority Claim for personal property taxes in the amount of $41,590.54, which Claim will be paid in equal quarterly installments commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

(f)    **Unsecured Priority Claim of the Town of Windham.**  As of the Petition Date, the Town of Windham held an unsecured priority tax claim for personal property taxes in the amount of $6,434.21, which claim will be paid in equal quarterly installments commencing on July 31, 2010 and continuing each quarter thereafter for a period of five (5) years.

(g)    **Unsecured Priority Tax Claim of the Town of Bloomfield.**  As of the Petition Date, the Town of Bloomfield held an unsecured priority tax claim for personal property taxes in the amount of $5,880, which claim will be paid in equal quarterly installments commencing on July 31, 2010 and continuing each quarter thereafter for a period of five (5) years.

(h)     **Unsecured Priority Tax Claim of the Town of Enfield.**  As of the Petition Date, the Town of Enfield held an unsecured priority claim for personal property taxes in the amount of $4,840, which claim will be paid in equal quarterly installments commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

2.    **Priority Non-Tax Claims.**

(a)     Unsecured Priority Claim of New England Health Care Employees Pension Fund.  As of the Petition Date, the New England Health Care Employees Pension Fund held an unsecured Priority Claim for benefit plan contributions in the amount of $101,455.07, which claim will be paid in equal monthly installments commencing on July 31, 2010 and continuing each quarter thereafter for a period of five (5) years.

3.    **Secured Claims.**

(a)     Class 2 – Secured Claim of HCI.  HCI, as assignee of HCRFSPC, holds a secured claim against the Providers under the Post-Petition Funding Facility for unsatisfied indebtedness and other obligations in respect of, among other things, unpaid discount fees, unsatisfied charge-backs and

other expenses and costs due and owing to HCI by the Providers under the Post-Petition Funding Facility, which debt is secured a first lien on Non-Purchased accounts, credit balances and substantially all other assets of the Providers, together with HCI's claims against Affinity, as assignee of HCRFSPC, under Affinity's Validity Guaranty as secured by a first lien of all assets of Affinity.  The Post-Petition Funding Facility was approved by the Bankruptcy Court by Order dated November 20, 2009 (as amended in minor respects by further Order dated December 30, 2009), wherein the Debtors entered into a Post-Petition Funding Facility which provides for the purchase by the factor, in its discretion, of commercial and governmental health care accounts of the Providers and, in turn, calls for the Providers to receive advances, financial accommodations and other post-petition funding from the factor.  Under the Post-Petition Funding Facility, HCRFSPC (and later HCI) received, among other things, a first priority security interest in the Purchased Accounts and in related Conveyed Property (as those terms are defined in the Purchase Agreement) sold by the Providers to the factor, as buyer thereof, in a true sale.

Additionally, the Providers granted to HCRFSPC (and later HCI, its assignee) an administrative super priority claim and the factor also received a security interest in Non-Purchased accounts (all accounts other than Purchased Accounts), credit balances and in all other assets of the Providers, other than Avoidance Actions and Avoidance Action Recoveries, as security for any indebtedness and unsatisfied obligations of the Providers to the factor under the Post-Petition Funding Facility arising from, among other things, charge-backs, expenses and costs due by the Providers to the factor.   Moreover, under the Post-Petition Funding Facility, Affinity entered into a Validity Guaranty of certain of the Providers' obligations and indebtedness due the factor, as more fully set forth in the Validity Guaranty and granted the factor a first lien on assets of Affinity to secure its obligations as Validity Guarantor (which secured claims by the HCI, as assignee of HCRFSPC, against Affinity in respect of the Validity Guaranty, together with HCI's secured claim against the Providers, as assignee of HCRFSPC, is hereinafter referred to collectively as "HCI Secured Debt".)   On the terms of the Exit Funding Facility Letter of Intent and Ratification, Assumption and Amendment Agreement between the Debtors, the Reorganized Debtors and HCI,

dated as of the Effective Date of the Plan, pursuant to §§ 105, 363(b), 1129 and 1142 of the Bankruptcy Code, the Reorganized Debtors shall assume and become parties to the Purchase Agreement and other funding documents, as amended therein, and the Post-Petition Funding Agreement shall be converted into an Exit Funding Facility under which the Reorganized Debtors shall continue to sell accounts and related Conveyed Property to HCI in a "true sale" from and after the Effective Date of the Plan.   Except as provided in the Intercreditor Agreement between HCI and HUD, in connection with the Exit Funding Facility, the HCI secured claim shall be assumed by the Reorganized Debtors and satisfied and paid under the terms of the Purchase Agreement as so amended in the Ratification, Assumption and Amendment Agreement, as more fully described in Section 7.03 of the Plan.

(b)    Class 3 – Secured Claim of DRS.   DRS shall be deemed to hold a secured claim in the amount of $591,345.45 for prepetition provider taxes adjusted for all post-petition payments received by DRS, and shall receive on account of its secured claim, equal quarterly payments over a two year period with the first payment commencing on July 31, 2010, plus statutory interest at 12% per annum.

(c)    Class 4 – Secured Claim of DSS.  DSS asserts that it holds a secured

recoupment claim for payments made by or on behalf of DSS, pursuant

to the State of Connecticut's Medicare Program for services rendered or

otherwise provided by or on behalf of any of the Debtors prior to the

Petition Date (regardless of whether any costs reports with respect to

such services were submitted or audited before or after the Petition

Date), which reimbursements or other payments DSS contends were

improperly made, were made in the wrong amount or otherwise

recoverable by DSS, in the total amount of $3,998,945.00.  The Secured

Claim of DSS shall be satisfied in the manner provided for in the State

Settlement Agreement.

(d)    Class 5 – Secured Claim of GMAC.  GMAC shall be deemed to hold a

secured claim in the amount of $16,571.23, adjusted for all post-petition

payments received by GMAC, and shall receive on account of its

secured claim, regular monthly payments in accordance with the terms of

the retail installment contract by and between the Debtors and GMAC to

secure performance of the payments, provided to adhere under GMAC

shall retain its lien and/or security interest in the pre-petition collateral

consisting of a 2007 Chevy Trailblazer, with the same force, effect and priorities, such lien and/or security interest held pre-petition.

(e)   Class 6 – Secured Claim of Great American.  Great American shall be deemed to hold a Secured Claim in the amount of $18,174.66, adjusted for all Post-Petition payments received by Great American, and shall receive on account of its Secured Claim regular monthly payments in accordance with the terms of the Lease Agreement by and between the Debtor and Great American.  To secure performance of the payments provided to it hereunder, Great American shall retain its lien and/or security interest in its pre-petition collateral consisting of an Inter-tel axxess 5200 Telephone System with the same force, effect and priorities such lien and/or security interest held pre-petition.

**4.**   **Class 7 – Holders of Unsecured Claims.**   Class 7 Claims includes all Rejection Claims and all other General Unsecured Creditors, but does not include intercompany claims, Claims of Metro, the IRS, the State, the Real Estate Entities or any other person or entities with whom there are settlements of administrative, priority non-tax, priority tax, or alleged secured claims, or whose administrative, priority non-tax, priority tax, or alleged secured claims are included in other classes or otherwise treated herein and does not include deficiency claims or the unsecured claims of

shareholders and members of the Debtors, whether or not such claims are held

individually or in trusts, which are being waived pursuant to Section 3.15 of the Plan,

all of which are expressly excluded from Class 7.   Each Holder of an Allowed

Unsecured Claim will be entitled to receive its Pro Rata Share in cash, of an amount

equaling ten (10%) percent of the total allowed Class 7 claims less those claims being

waived by members and shareholders of the Debtors (the "Fund").   The Fund will be

funded over a five year period from operations, and will be paid in equal quarterly

installments over a five-year period commencing on July 31, 2010 provided, however,

that the Creditor's Committee, at its option, may direct one or more of the Distributions

to be paid in accordance with Section 5.01 herein, to be directed instead to the person,

entity or other vehicle designated by the Creditors Committee to prosecute the

Avoidance Actions to fund the fees and expenses incurred in connection with the

prosecution of such Avoidance Actions.   In addition, each Holder of an Allowed

Unsecured Claim will be entitled to receive a Pro Rata Share of the Avoidance Action

Recoveries and Unclaimed Property  Only allowed unsecured claims are entitled to

distribution.  No disputed claim shall receive a distribution unless and until such claim

becomes an Allowed Claim by Final Order.

**5.**     **Class 8 -- Common Shareholder Interests.**   Class 8 Interests consists of

those ownership interests in each of the five Debtors as shown Exhibit 5 attached to

the Plan.  The Holders of the Class 8 Interests will repurchase their existing equity interests for a total capital investment of $300,000 in cash.  Additionally, Class 8 Interests will facilitate funding for the Reorganized Debtors through the additional borrowings to be made by certain members of Class 8 as set forth and described in the HUD Settlement.  Further, those Class 8 interests who also hold unsecured claims against the Debtors, whether or not such claims are held individually or in trusts, will waive distribution on such claims.

C.    Administrative Claims

1.    Administrative Claims for Professional Fees.  The Debtors estimate that upon the Effective Date, there will be approximately $750,000 of accrued and unpaid Professional Fees, which include $394,000[3] of fees held back from prior Fee Applications pending submission and approval of Final Fee Applications.  The Debtors shall pay Allowed Professional Fees as determined by the Court, and shall pay such allowed amounts as determined by the Court in twelve equal monthly installments of the amounts due each Professional.  The first payment shall be made on the later of (i) August 10, 2010 or (ii) the tenth day after the Order Approving Fees becomes final, and on the tenth day of each month thereafter.

---

[3]    Approximately $140,000 of this amount represents fees and expenses claimed by Eiseman Levin Lehrhaupt & Kakoyiannis PC and Hofheimer Gartlir & Gross, LLP, which fees are in dispute.

2.      **Administrative Claims Other Than Administrative Claims for Professional Fees.**  Allowed Administrative Claims, other than Administrative Claims for Professional Fees, will be paid as set forth below:

(a)      **Section 503(b)(9) Claims.**  Holders of 503(b)(9) claims are unimpaired and do not vote on the Plan.  The following holders of 503(b)(9) claims shall receive in full satisfaction, release and discharge of such claim, the amount of such allowed 503(b)(9) claim in cash installments are set forth below, and as agreed to by the Debtors and the Holders of the 503(b)(9) claims.

(i)      **Value Health Care Services LLC.**  Value Health Care Services LLC holds an administrative claim pursuant to § 503(b)(9) of the Bankruptcy Code in the amount of $61,000.00, which claim shall be paid in equal quarterly installments, commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

(ii)      **Connecticut Support Services, LLC.**  Connecticut Support Services, LLC holds an administrative claim pursuant to § 503(b)(9) of the Bankruptcy Code in the amount of $7,013.05, which claim will be paid in equal quarterly installments, commencing on

44

July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

        (iii)    **Medline Industries.**    Medline Industries holds an administrative claim pursuant to § 503(b)(9) of the Bankruptcy Code in the amount of $25,157.01, which claim will be paid in equal quarterly installments, commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

        (iv)    **Dusso Food Service.**    Dusso Food Service holds an administrative claim pursuant to § 503(b)(9) of the Bankruptcy Code in the amount of $53,340.43, which claim will be paid in equal quarterly installments, commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

(b)    Post-Petition trade debt will be paid by the Debtors in accordance with their terms.

(c)    **Aetna**.  Aetna asserts an administrative claim for reconciliation charges due following the termination of an insurance plan in the amount of $124,861.19.  The claim is disputed by the Debtors.  The claim, if allowed, will be paid in equal quarterly installments commencing on July

31, 2010, and continuing each quarter thereafter for a period of five (5) years.

**D.      Sources of Funding for the Plan**

(i)      **Plan Funding.**  The Plan will be funded from cash on hand, financing, the capital contribution by the Class 6 interests and future operations, and from the sale of accounts and related Conveyed Property to HCI under the Exit Funding Facility, from and after the Effective Date of the Plan.

(ii)      **Cash on Hand:** the Debtor expects to have approximately $115,000 cash on hand on the Effective Date generated from operations.

(iii)      **Capital Contribution:**

(A)      Class 8 Interests will make capital contributions consisting of a combination of cash and property.  As part of the HUD Settlement, HHF will loan $450,000 to Benjamin Z. Fischman to be secured by his and Samuel Strasser's interest in the Real Estate Entities.  In addition, HHF will make an Operating Loss Loan to Property A in the amount of $1,250,000, which will be insured by HUD under the provision of Section 232, pursuant to Section 223(d)(3) of the National Housing Act, and Regulations now in effect thereunder.  The proceeds of the Loan and the Operating Loss Loan, will be

utilized to cure the mortgage arrearages, as well as pay other fees necessary to enable the Mortgages on Property A, Property B and Property D to be restated, reassigned and restructured.   Upon reassignment, the mortgages will be restructured to reduce the interest rates on the mortgages held on Property A, Property B and Property D.  HUD will continue to hold the mortgage on Property E, which mortgage will be restructured to reduce the interest rate so that the Debtors' rental payments can be commensurately reduced.   The reduction in the interest rates will enable the Real Estate Entities to charge a significantly reduced rent to the Operating Entities, which will result in an annual savings of approximately $850,000.   It is anticipated that there will be approximately $250,000 remaining from the proceeds of the HHF Loan and the Operating Loss Loan after paying the aforesaid cure amounts and fees which will be loaned by Benjamin Z. Fischman and Alexandria Manor Associates, LLC to the Debtors for use in operations.   Additionally, Class 8 Interests will make an equity contribution of $300,000.00 in cash to the Debtors at the time of confirmation of the Plan.

(iv)     **Operations.**  Payments to be made under the Plan will be generated in part from operations throughout the term of the Plan.

47

 

(v)   **Exit Funding Facility.**   The Ratification, Assumption and Amendment Agreement will convert the Post-Petition Funding Facility into the Exit Funding Facility.   The term of the Exit Funding Facility will be one (1) year[4], subject to footnote 4 below, and as more fully delineated in the Ratification, Assumption And Assignment Agreement, unless earlier terminated or later extended pursuant to its terms.   Most terms and conditions of the Post-Petition Funding Facility will continue in the Exit Funding Facility.

**E.**   **Executory Contracts Under the Plan**

1.   **Treatment of Executory Contracts and Unexpired Leases**.   Except as provided in Section 6.03 of the Plan, any and all pre-petition executory contracts

---

[4]   An initial term through December 31, 2010, plus a further committed extension, subject to the terms of the Ratification, Assumption and Amendment Agreement, to bring the total term to twelve (12) months (including the initial term aforesaid), provided that (a) the variance between (i)  the actual cumulative operating cash flows for the period June 1, 2010 through December 31, 201, as compared to the projected cash flows for such period in the latest projections provided to HCI on April 26, 2010, do not vary adversely by more than 7.5% from the latest projections so provided to HCI (provided, however, that further capital contributions by Benjamin Fischman and Sam Strasser during such period, above those shown in the projections given to HCI on April 26th, shall be treated as operating cash flow for this purpose) and (ii) the ending cash balance on December 31, 2010, as compared to the projected ending cash balance at that time in such projections, do not vary adversely by more than 5%; (b) there has been no prior material default nor any material default then existing under the Exit Funding Facility and (c) there is no material increase (15% or more) in the amount and aging of trade payables, as to any age category (current, 30-day, 60-day, 90-day, and over 120-days), at December 31, 2010, compared to the aging and amount of trade payables on April 27, 2010.

including unexpired leases of the Debtors and HUD Regulatory Agreements, that (i) have not been expressly assumed or rejected prior to the Confirmation Date by order of the Bankruptcy Court or by operation of law; (ii) or which are not the subject of pending applications to assume or reject on or before the Confirmation Date and thereafter assumed or rejected, as the case may be, by order of the Bankruptcy Court, or (iii) is subject to Sections 6.02 and 6.06 of the Plan, shall be deemed rejected in accordance with Section 1123(b)(2) of the Bankruptcy Code.

2. **Treatment of Real Estate Leases.**  All real estate leases, with the exception of the lease between Ellis and Reliance Health Care Associates, LLC, are hereby expressly rejected as of the Confirmation Date and all cure costs and rejection damages are waived.  The lease between Ellis and Reliance Health Care Associates, LLC is hereby assumed upon confirmation of the Plan without payment of cure amounts, and will be modified in accordance with the terms of HUD Settlement Agreement.

3. **Disallowance of Claims Arising from Rejected Contracts or Leases.** Any Holder of a Claim arising from the rejection of an executory contract or unexpired lease that fails to file such Proof of Claim by the date specified in an Order of the Bankruptcy Court or the Bankruptcy Rules, shall be forever barred, estopped and enjoined from asserting such Claim in any manner against the Debtors or their

Property, or against Reorganized Debtors and its Property and the Debtors, Reorganized Debtors, and their estate and property shall be forever discharged and released from all indebtedness or liability with respect to such Claims, and such Holder shall not be permitted to vote on the Plan or to participate in any distribution and shall be bound by the terms of the Plan.

4.     **Cure of Defaults**.  Except to the extent that different treatment has been agreed to by the non-debtor party or parties to an executory contract or unexpired lease to be assumed pursuant to Section 6.01 of the Plan, the Debtors shall, pursuant to the provisions of Sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code in consistent with the requirements of Section 365 of the Bankruptcy Code, within sixty (60) days of the Effective Date, file a pleading with the Bankruptcy Court listing the cure amounts of all executory contracts to be assumed.  The parties to such executory contracts to be assumed by Debtors shall have thirty (30) days to object to the cure amounts listed by Debtors.  If there are any objections filed, the Bankruptcy Court shall hold a hearing.  At all times prior to the Effective Date, the Debtors shall retain the right to reject any of the executory contracts on the schedule of the contracts to be assumed.

5.    **Classification of Rejection Claims.**   Any Claims arising out of the rejection of executory contracts and unexpired leases shall, pursuant to Section 502(g) of the Code, be treated as Class 6 Unsecured Claims.

6.    **Provider Agreements and Inter-Debtors Agreements.**   As of the Effective Date, all (i) executory contracts and unexpired leases between and among any of the Debtors are specifically assumed hereby without payment of cure amounts, except as otherwise provided in the Plan and the HUD Settlement, and (ii) provider agreements that exist between the Debtors and either the federal government or any state government in connection with the participation of the Debtors in the Medicare and Medicaid programs are hereby assumed.   Notwithstanding anything to the contrary in the Plan or any of its Exhibits, Medicare's right of recoupment, and CMS's administration of the Debtors' Medicare Provider Agreements pursuant to federal Medicare laws are regulations, are unaffected by the confirmation of the Plan.

7.    **Post-Petition Funding Facility.**   The Reorganized Debtors will also, via the Ratification, Assumption and Amendment Agreement and the Plan, assume the Debtors' obligations under the Post-Petition Funding Facility and, without limitation, satisfy the HCI secured claim, as more fully set forth therein and herein.

F.    **Retention of Jurisdiction**

Under the Plan, the Bankruptcy Court shall retain jurisdiction of the Chapter 11 cases for the following purposes:

(i)     allow, disallow, determine, liquidate, classify, estimate or establish the priority or status of any Claim, whether arising before or after the Petition Date, including the compromise, settlement and resolution of any request for payment of any Administrative Expense Claim or Priority Claim, and to hear and determine any other issue presented relating to the Objection to any Claim or Interest;

(ii)    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain or prevent or restrain interference by any Person or entity with the consummation, implementation or enforcement of the Plan, Plan documents or the Confirmation Order; including (i) Claims subject to litigation pending as of the Effective Date and (ii) the waiver, release, injunction and exoneration provisions hereof;

(iii)   to determine all matters that may be pending before the Court in the Case on or before the Effective Date with respect to any Person;

(iv)    to determine any and all motions relating to the sale of the Debtor's assets, including requests for approval of bid procedures and motions relating to the approval of a sale;

(v)     to determine any and all applications for allowance of compensation and expense reimbursement of Professionals for periods on or before the Effective Date;

(vi)    to adjudicate and resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and any settlement approved as part of the Plan, and the making of distributions hereunder;

(vii)    to determine any and all motions for rejection, assumption or assignment of executory contracts or leases and to determine the allowance of Claims resulting from the rejection of executory contracts and unexpired leases;

(viii)   to determine all applications, adversary proceedings, contested matters, actions and any other litigated matters  instituted prior to the closing of the Case, including any remands;

(ix)    to determine such other matters as may be provided in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code, Rules or local Bankruptcy Rules;

(x)    to modify the Plan under Section 1127 of the Code, remedy any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out the Plan's intent and purposes;

(xi)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(xii)    to resolve any dispute or matter arising under or in connection with any order of the Court entered in the Case;

(xiii)   to enter a Final Order closing the Case; and

(xiv)   to determine such other matters as set forth in the Confirmation Order or as may arise in connection with the Plan or the Confirmation Order, and/or in connection with any other agreement, settlement or transaction entered into pursuant to or in connection with this Plan.

## G.    Conditions Precedent To Confirmation Of The Plan

All provisions of the Plan to the contrary notwithstanding, it shall be a condition precedent to confirmation of the Plan unless waived (if waivable) that on or prior to the date of the confirmation order:

(a)    The Debtors shall obtain approval of their entry into the Exit Funding Facility described in Section 7.03, via a Bankruptcy Court Order acceptable to HCI (the "Exit Funding Facility Order") approving the Exit Funding Facility Motion  and all documents and instruments required by and pertaining to same shall have been executed and delivered; and

(b)    The Debtors shall obtain authority to enter into the HUD Settlement Agreement described in Exhibit 2 to the Plan; and

(c)    The Debtors shall obtain approval to enter into the State Settlement Agreement described in Exhibit 3 to the Plan; and

(d)    The Court shall have entered order/orders approving the agreements and instruments to be entered pursuant to the Plan whether by separate orders or as part of the confirmation order, including but not limited to, approval of the settlements described herein; and

(e)    The Bankruptcy Court shall have determined that the voting requirements of the Code have been satisfied.

The Effective Date shall not occur unless and until the following conditions have occurred or have been fully waived (if waivable), as set forth below:

(a)     The Confirmation Order shall have been entered, and such order shall not have been stayed, vacated or reversed or enjoined by order of a court of competent jurisdiction;

(b)     the Mortgage restructurings as provided in the HUD Settlement will have closed;

(c)     All documents or agreements required to be executed or delivered under the Plan on or prior to the Effective Date shall have been executed and delivered;

(d)     The Exit Funding Facility required by the Plan or Final Order of the Bankruptcy Court will have closed and the initial funding thereunder shall have occurred;

(e)     All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness, shall have been obtained.

(f)     The Debtors shall have paid, or established reserves sufficient to pay, any amounts due to the Office of the Untied States trustee for the period prior to the Confirmation Date.

The Debtor may consummate the Plan prior to the expiration of the appeal period of the Confirmation Order.

## IV.    VOTING ON AND CONFIRMATION OF THE PLAN

In order to confirm the Plan, the Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including that:

(a)    The Plan has classified Claims and interests in a permissible matter;

(b)    The Plan complies with the technical requirements of Chapter 11 of the Code;

(c)    The Debtors have proposed the Plan in good faith;

(d)    The Debtors' Disclosures as required by Chapter 11 of the Code have been adequate and have included information concerning all payments made or promised by the Debtors in connection with the Plan and the Chapter 11 case.  The Debtors believe that all of these conditions will have been met by the date set for the hearing on Confirmation and will seek ruling of the Bankruptcy Court to such effect at such hearing; and

(e)    The Code also requires that the Plan shall have been accepted by the requisite votes of Creditors, the Plan be feasible (that is, that there be a reasonable prospect that the Debtors will be able to perform its obligations under the Plan and continue to operate its businesses without

further financial reorganization), and that the Plan is in the "best interest" of all Creditors and equity security holders (that is that the Creditors and equity security holders will receive at least as much pursuant to the Plan, as they would receive in a Chapter 7 liquidation).  To confirm the Plan, the Bankruptcy Court must find that all of these conditions are met. Thus, even if Creditors of the Debtors accept a Plan by requisite votes, the Bankruptcy Court must make independent findings respecting the Plans feasibility and whether it is in the best interest of the Debtors, Creditors and equity security holders before it may confirm the Plan.  The statutory conditions as to confirmation are discussed below.

**A.    Classification of Claims and Interests**

The Code requires that a Plan of Reorganization place each Creditor's Claim, each Security Holder's Claim and each Claim of Interest in a class with other claims and interests that are "substantially similar" for the rationale, for the classification of claims and interests used in the Plan, see Article III "Classification and Treatment of Administrative Expense Claims, Tax Claims and of Claims and Interests."   The Debtors believe that the Plan meets the classification requirements of the Code.

**B.    Voting**

As otherwise provided in Code §1129(b), as a condition to confirmation, the Code requires that each Impaired Class of Claims accept the Plan. A class is "Impaired" if the legal, equitable, or contractual right attaching to the Claims of that class are modified, other than by curing defaults and reinstating maturity or by payment in full in cash. The Code defines acceptance of a Plan by an impaired class of Claims as acceptance by holders of two-thirds (2/3) in dollar amount and majority in number of Claims of that class, but, for that purpose counts only those who actually vote to accept or reject the Plan. The Code defines acceptance of a Plan by an Impaired Class of interest or acceptance by holders of two-thirds (2/3) of the number of shares in such Claim, but for this purpose only shares actually voted are counted holders of claims of interest who fail to vote are not counted as either accepting or rejecting the Plan.

Classes of Claims that are not "Impaired" under the Plan are deemed to have accepted the Plan.

### C.   Confirmation Without Acceptance by All Impaired Classes

The Code contains provisions for confirmation of a Plan even if the Plan is not accepted by all impaired classes, as long as at least one impaired class has accepted it. The "cram down" provisions of the Code are set forth in §1129(b) of the Code. A Plan may be confirmed under the cram down provisions if in addition to satisfying the

other requirements of the §1129 of the Code, it (i) "does not discriminate unfairly", and (ii) is "fair and equitable", with respect to each class of Claims or Interests that is impaired under, and has not accepted the Plan.  As used by the Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.

In general, the cram down standard requires that a dissenting class receive full compensation for its allowed Claims or interest before any junior class receives any distribution.

The Debtors shall utilize provisions of §1129(b) of the Code to satisfy the requirements for confirmation of the Plan as more fully described in the Plan, see Article XVII, "Miscellaneous Provisions."

### D.   Best Interests of Creditors and Shareholders

Notwithstanding acceptance of the Plan, as provided for in the Code, by creditors of each Class, in order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of all classes of creditors impaired by the Plan.  The "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of each impaired class of Claims and Interests, a recovery that has a value at least equal to the value of the distribution that each such person would receive if the Debtors were liquidated under Chapter 7 of the Code.

To estimate what members of each impaired class of unsecured creditors would receive if the Debtors were liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Chapter 11 cases were converted to Chapter 7 cases under the Code and the assets were liquidated by a Trustee in bankruptcy (the "Liquidation Value").  The Liquidation Value would consist of the net proceeds from the disposition of the assets of the Debtors, augmented by any cash held by the Debtors.

The Liquidation Value available to general unsecured creditors would be reduced by:

(a)     The claims of secured creditors to the extent of the value of their collateral; and

(b)     The costs and expenses of the liquidation, as well as other administrative expenses of the Debtors' Estate.  The Debtors' costs of liquidation under Chapter 7 would include the compensation of a Trustee or Trustees, as well as counsel and other professional retained by the Trustee; disposition expenses; all unpaid expenses incurred by the Debtors during their Chapter 11 reorganization proceedings (such as compensation for attorneys, financial advisors, and accountants) which are allowed in the Chapter 7 proceedings; litigation costs; and claims arising from the operation of the Debtors during the pendency of the Chapter 11 cases and the Chapter 7 liquidation proceedings.   These claims which have priority over general unsecured claims, would be paid in full out of other liquidation proceeds before the balance would be made available to pay general unsecured claims, or to make any distribution respect to equity.

Once the percentage recoveries in the liquidation of secured creditors, priority claimants, general creditors and equity security holders are attained, the value of the distribution available out of the liquidation value, is compared with the value of the property offered to each of the Classes of Claims in interest under the Plan to determine if the Plan is in the best interest of each creditor and equity security holder class.

The Debtors have undertaken the detailed analysis of the Liquidation Value of its assets. Based on the Debtors' review, the liquidation analysis is set forth on Exhibit B. Exhibit B demonstrates that there would not be sufficient funds to make any distribution to pay allowed unsecured Claims following a complete liquidation of the Debtor.

Due to the numerous uncertainties and time delays associated with liquidation under Chapter 7, and the circumstances of this particular case, it is not possible to predict with certainty the outcome of the liquidation of the Debtors or the priming of any distribution to creditors. However, based on the foregoing analysis, the Debtors have concluded the complete liquidation of the Debtors under Chapter 7 of the Code would result in a significantly lesser distribution to Creditors than provided for in the Plan.

**E.       Alternatives to the Plan**

The only known alternatives to the Debtors' Plan would be conversion of the case from a Chapter 11 reorganization to a Chapter 7 liquidation of Debtors' assets by a Trustee or an outright dismissal of the Chapter 11 case.

In the event of a liquidation under a Chapter 7, the going concern value and substantial good will that has been developed by the Debtors after over twenty years of operation would be lost, and the value of the assets substantially diminished to a point where not only would there be nothing for unsecured creditors, but the Estates would likely become administratively insolvent.

For the reasons described above, the Debtors believe that the distribution to each impaired Class under the Plan would be greater and earlier than distributions that might be received after liquidation of the Debtors by a Chapter 7 Trustee.

The Debtors believe the confirmation of the Plan is preferable to the alternatives described above because the Plan provides for an equitable, early distribution to creditors, Creditors and any alternative confirmation of the Plan would result in significant delays in and probable diminution of recoveries.

Further, the Debtors' businesses provides essential services to the community. The Debtors are nursing homes that provide the highest level of care to close to 400 patients who depend on the Debtors for health safety and well-being.  Additionally, the

Debtors employ over 450 employees.  As such, reorganization of the Debtors so that operations can continue are better alternatives.

### F.    Modification of the Plan

The Debtors reserve the right, in accordance with the Code, to amend or modify the Plan prior to the confirmation date, or as soon thereafter as practicable after the confirmation date, the Debtors may, upon order of the Bankruptcy Court in accordance with §1127(b) of the Code, remedy any defect or omission or reconcile any inconsistencies in the Plan in such a manner as may be necessary to carry out the purposes and intent of the Plan.

### G.    Confirmation Hearing

The Code requires that the Bankruptcy Court, after notice, to hold a hearing on the confirmation of the Plan to consider whether the foregoing requirements have been met.  The confirmation hearing has been scheduled for **May ___, 2010, at _____** a.m./p.m.  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for the announcement of the adjourned date made at the confirmation hearing.  Any objection to confirmation must be made in writing and filed with the Bankruptcy Court and served upon the following on or before May ____, 2010.

Elizabeth J. Austin, Esq.
Jessica Grossarth

Pullman & Comley, LLC
850 Main Street, P.O. Box 7006
Bridgeport, CT  06601-7006
***Attorneys for the Debtors***

Holley Claiborn, Esq.
**Office of the U.S. Trustee**
The Giaimo Federal Building
150 Court Street, Room 302
New Haven, CT  06510

Mark I. Fishman, Esq.
Nancy Kinsella, Esq.
Neubert, Pepe & Monteith
195 Church Street – 13th Floor
New Haven, CT 06510-2009
***Attorneys for the Official Unsecured Creditors Committee***

V.     **RELEASES**

(a)     The Plan provides that upon the completion of all payments thereunder

(the "Release Date"), and in consideration of the property distributed to

or on behalf of the Holders of Claims pursuant to this Plan, such Holders

shall have been deemed to have released the Debtors, the Real Estate

Entities, the Creditors Committee and its members, the Release Parties

and each of their respective agents, professional persons, advisors and

representatives in such capacity, from any and all claims, obligations,

rights, causes of action and liability (other than the right to enforce the

Debtors' obligations under the Plan and other than the right of the

Holders to assert claims against individuals resulting from their personal liability, as contract parties, responsible persons, co-obligors, guarantors, or otherwise), which such holder may be entitled to assert, whether known or unknown, foreseen or unforeseen, then existing or thereafter arising based in whole or in part prior to the Effective Date, in any way relating to the Debtors, the Chapter 11 case, the Disclosure Statement or the Plan, except as otherwise provided in the State Settlement Agreement appended hereto as Exhibit 3 and in the Exit Funding Facility documents.  All applicable statute of limitations or repose and similar provisions shall be tolled until the Release Date.

(b)    **Release by Debtors.**  The Plan also provides that on the Release Date, the Debtors, in consideration for services rendered by the Debtors' former and present officers, directors and employees prior to and during the pendency of the Chapter 11 case, other than Avoidance Actions (except as to the Release Parties), whether known or unknown, foreseen or unforeseen, then existing or thereafter arising, which are based in whole or in part on actions taken on or prior to the Effective Date, and which may be asserted by or on behalf of the Debtors against such former and present officers, directors, employees of the Debtors.

Moreover, as an inducement to HCI to provide the Exit Funding Facility, the Debtors shall be deemed to have waived and released any and all claims, obligations, rights, causes of action and liabilities against HCRFSPC and HCI, and their respective employees, officers and agents, arising before the Effective Date, other than claims for the balance payments due under the Post-Petition Funding Facility. All applicable statutes of limitations or repose or similar provisions shall be tolled until the Release Date.

All applicable statute of limitations or repose and similar provisions shall be told until the Release Date.

## VI.   AVOIDANCE ACTIONS

The Plan provides that all Avoidance Actions and causes of action pursuant to, among other things, Chapter 5 of the Bankruptcy Code, are hereby preserved for the benefit of Class 7 and that the Creditors Committee retains the right to prosecute Avoidance Actions through an appropriate person, entity or other vehicle, at its option or designation, including a Creditors' Trust or Grantors' Trust with the Debtors. Such Avoidance Actions may be brought by such a person, entity or other vehicle, and professionals retained, without further order of the Court, except that no Avoidance Action shall be commenced for an aggregate amount less than $10,000. The Debtors

will provide such person, entity or other vehicle with reasonable access to the Debtors'
records and personnel for purposes of identifying, investigating and prosecuting the
Avoidance Actions.  The Creditors Committee will be compensated for the prosecution
of Avoidance Actions solely from Avoidance Action Recoveries, and any distributions
designated by the Creditors' Committee to be paid from the Fund in accordance with
Section 3.14 of the Plan to fund the fees and expenses incurred in connection with the
prosecution of such Avoidance Action.  Attached hereto as Exhibit D is a list of all
potential avoidance action defendants.

**VII.**     <u>**RECOMMENDATION TO ACCEPT THE PLAN**</u>

      FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT,
THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE CONFIRMATION AND
CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER
ALTERNATIVES.

**VIII.**     <u>**TAX CONSEQUENCES**</u>

      The Debtors have not researched the Federal Income Tax consequences of the
Plan to holders of claims and interests, based upon the Internal Revenue Code.  The
Debtors have not requested a ruling from the Internal Revenue Service with respect to
these matters.  Accordingly, no assurance can be given as to the interpretation of the
Internal Revenue Service.  Further, the Federal Income Tax Consequences to any

particular creditor or interest holder may be affected by matters not discussed herein. There also may be state, local or foreign tax considerations applicable to each creditor or holder of an interest. **EACH CREDITOR AND HOLDER-IN-INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN AND THE FEDERAL AND APPLICABLE STATE. LOCAL AND FOREIGN TAX LAWS.**

## IX.    <u>CONCLUSION</u>

THE DEBTORS AND THE COMMITTEE URGE ALL VOTING CLASSES TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY _____ A.M./P.M. ON MAY ____, 2010.

Dated at Bridgeport, Connecticut this 27th day of April, 2010.

**Affinity Health Care Management, Inc., et al**

By:  /s/ Benjamin Z. Fischman____
      Benjamin Z. Fischman
      Its President

**Health Care Investors, Inc., d/b/a Alexandria
                          Manor**

By:  /s/ Benjamin Z. Fischman____
      Benjamin Z. Fischman
      Its President

**Health Care Reliance, Inc., d/b/a Blair Manor**

By:  /s/ Benjamin Z. Fischman____
      Benjamin Z. Fischman
      Its President

**Health Care Assurance, LLC, d/b/a Douglas Manor**

By:  /s/ Benjamin Z. Fischman____
      Benjamin Z. Fischman
      Its President

By:  /s/ Benjamin Z. Fischman
     Benjamin Z. Fischman
     Its Managing Member


**Health Care Reliance, LLC., d/b/a Ellis Manor**

By:  /s/ Benjamin Z. Fischman
     Benjamin Z. Fischman
     Its Managing Member


Pullman & Comley, LLC
Attorneys for the Debtors
AFFINITY HEALTH CARE MANAGEMENT, INC., ET AL

By:  /s/ Elizabeth J. Austin
     Elizabeth J, Austin (ct04383)
     Jessica Grossarth (ct23975)
     Pullman & Comley, LLC
     850 Main Street, P.O. Box 7006
     Bridgeport, CT  06601-7006
     (203) 330-2000  Fax:  (203) 576-8888
     eaustin@pullcom.com
     igoldman@pullcom.com
     jgrossarth@pullcom.com

ACTIVE/72743.1/EA/801857v7