**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| AFFINITY HEALTH CARE MANAGEMENT, INC., *et al*,[1] | Case No.  08-22175 (ASD) |
| | (Jointly Administered) |
| Debtors | May 6, 2010 |

**DEBTORS' MOTION FOR ORDER UNDER SECTIONS 105, 363(B), 1129 AND 1142 OF THE BANKRUPTCY CODE AND FED. R. BANKR. P. 2002, 6004, 9006 AND 9007, IN AID OF CONFIRMATION, AUTHORIZING THE DEBTORS TO ENTER INTO CERTAIN AGREEMENTS IN CONNECTION WITH AN ANTICIPATED EXIT FUNDING FACILITY AND FOR AUTHORITY TO INCUR AND PAY FEES AND COSTS IN CONNECTION THEREWITH**

Affinity Health Care Management, Inc. ("Affinity"), Health Care Investors, Inc. d/b/a Alexandria Manor ("Alexandria"), Health Care Alliance, Inc. d/b/a Blair Manor (Blair"), Health Care Assurance, L.L.C. d/b/a Douglas Manor ("Douglas"), and Health Care Reliance, L.L.C. d/b/a Ellis Manor ("Ellis") (collectively, the "Affiliates") and jointly with Affinity, the debtors and debtors in possession (the "Debtors"), by their undersigned counsel, hereby move this Court for entry of an order, pursuant to Fed. R. Bankr. P. 9006(c)(1) and sections 105, 363 and 1142 of Title 11 of the United States Code (the "Bankruptcy Code"), authorizing (a) their entry into a Letter of Intent for an Exit Funding Facility, and (b) authority to pay fees and costs in connection therewith.

---

[1] Affinity Health Care Management, Inc., Case No. 08-22175, Health Care Investors, Inc. d/b/a Alexandria Manor, Case No. 08-22177, Health Care Alliance, Inc. d/b/a Blair Manor, Case No. 08-22178, Health Care Assurance, L.L.C. d/b/a Douglas Manor, Case No. 08-22179, and Health Care Reliance, L.L.C. d/b/a Ellis Manor, Case No. 08-22180.

## JURISDICTION AND VENUE

1.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

2.  On October 15, 2008 (the "Petition Date"), Affinity Health Care Management, Inc., the Lead Debtor, together with its affiliated debtors, Health Care Investors, Inc., d/b/a Alexandria Manor, Health Care Alliance, Inc., d/b/a Blair Manor, Health Care Assurance, Inc., d/b/a Douglas Manor, and Health Care Reliance, LLC, d/b/a Ellis Manor (collectively, the "Debtors"), filed voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York.  The Court entered an order of Joint Administration on October 22, 2008.  Subsequently, the Court, by Order of October 30, 2008, transferred venue to this Court.

3.  Pursuant to 11 U.S.C. §§ 1107(a) and 1108, the Debtors continue to operate their businesses and manage their financial affairs as debtors in possession.  No trustee or examiner has been appointed in the jointly administered cases of the Debtors and a Creditors Committee has recently been appointed.

4.  The Lead Debtor, "Affinity", manages the business affairs of its four affiliated debtors.  The four affiliated provider debtors, Health Care Investors, Inc., d/b/a Alexandria Manor, Health Care Alliance, Inc., d/b/a Blair Manor, Health Care Assurance, Inc., d/b/a Douglas Manor, and Health Care Reliance, LLC, d/b/a Ellis Manor (collectively, the "Providers", and together  with the Lead Debtor, the "Debtors")

each operate a skilled nursing facility in Connecticut. Collectively, there are over 400 beds in these facilities and the Debtors have over 500 employees.

5. The filing of the cases were precipitated by the Debtors' operating losses and their incurrence of substantial debt, beyond their ability to repay as the debts were coming due.

6. Since the Petition Date, the Debtors have been operating using cash collateral as authorized by orders of the Court.

7. The Debtors have consolidated annual revenues of more than $40 million and generate significant healthcare receivables, which collect at various times, depending on the payor. The bulk of these receivables are payable to the Debtors principally by Medicare, Medicaid and by various commercial or private payors.

## POST-EFFECTIVE DATE (EXIT) LIQUIDITY FUNDING

8. Under the terms of a Non-Recourse Health Care Accounts Receivable Purchase Agreement (the "Purchase Agreement") and related funding documents dated November 18, 2009, as thereafter amended, from time to time (the "Post-Petition Funding Facility"), as approved by the Bankruptcy Court on November 20, 2009 (as amended, in minor respects, by further Order dated December 30, 2009) on November 23, 2009, the Providers agreed to sell substantially all of their accounts and related books, records and other Conveyed Property to Health Capital Receivables Funding Special Purpose Corporation I, a New York corporation ("HCRFSPC") in a "true sale", with HCRFSPC taking a first priority security interest in such assets as buyer and owner thereof. Thereafter, the Post-Petition Funding Facility was amended, from time to time, to, among other things, extend its ninety (90) day term and to reflect the assignment of HCRFSPC's position to Health Capital Receivables Funding Administrative Corporation,

a New York corporation ("HCI"). The Providers received an advance of approximately 85% of the purchase price of the subject accounts on November 25, 2009, as a partial pre-payment of the purchase price for accounts sold to HCRFSPC on that date. At present, the Providers continue to sell substantially all their accounts and related books, records and other Conveyed Property to HCI on a weekly-basis receiving from HCI, an initial 80% initial advance against the purchase price. As each "batch" of accounts sold to HCI closes, upon all accounts in the particular batch being collected, charged-back or otherwise credited, HCI thereupon credits a balance payment to the Providers equal to the purchase price of subject accounts in the batch, less the initial advance thereon and less unpaid discount fees and any other costs and expenses then due to HCI by the Providers.

9. Under the Post-Petition Funding Facility, HCI also receives a first priority security interest, as lender, in Non-Purchased Accounts (all accounts not sold to HCI, such as self-pay accounts), in credit balances owed by HCI to the Providers in respect of accounts sold to HCI, and in substantially all other assets of the Debtors, as security for obligations and indebtedness of the Providers to HCI under the Post-Petition Funding Facility arising from unsatisfied charge-backs, and discount fees and other costs and expenses due and owing by the Providers to HCI.

10. After the Court approved the Purchase Agreement, the Providers' received the initial funding under the Post-Petition Funding Facility on November 25, 2009 which enabled the Debtors to implement a settlement with Metro Exchange LLC ("Metro") and the United States Internal Revenue Service (the "IRS") which resulted in the secured claims of the IRS and Metro being satisfied in full, and the initial funding

also provided monies that partially funded a settlement with the State of Connecticut Department of Revenue Services.

11.    Under the Debtors' Third Amended Joint Plan of Reorganization filed May 6, 2010, as it may be later amended prior to confirmation (the "Plan"), the Post-Petition Funding Facility between HCI and the Debtors will be replaced with an Exit Funding Facility between HCI and the Reorganized Debtors upon their emergence from Chapter 11.

12.    On April 9, 2010, the Debtors filed their Disclosure Statement and the Plan; subsequently, the Plan and the Disclosure Statement were amended on April 21, 2010, and again on April 28, 2010.[2] There are several material conditions that must occur prior to the Debtors' being in a position to confirm their Plan.  One material condition to confirmation is the conversion of the Post-Petition Funding Facility provided to the Providers by HCI under the Purchase Agreement into an Exit Funding Facility upon confirmation of the Plan and occurrence of the Effective Date of the Plan. Specifically, the Plan contemplates that HCI will, in accordance with the Purchase Agreement, as amended and assumed pursuant to a Ratification, Assumption and Amendment Agreement (the "Ratification Agreement")[3] , between the Providers, Affinity and HCI, together with the Letter of Intent attached hereto as Exhibit A, and the various documents and instruments called for by the Purchase Agreement and the Ratification Agreement, once executed and delivered in final form (collectively, the "Exit Funding

---

[2] The Plan filed that day was the Second Amended Plan of Reorganization.  Minor amendments have been made to that time to state more clearly the terms and conditions of the HCI exit funding, correct the name of a lender, Housing & Healthcare Finance, LLC, originally mis-identified as a corporation, and to incorporate the updated Ratification, Assumption and Amendment Agreement with HCI.

[3] This Agreement is Exhibit "4" to the Plan. The final version of this document, presently in draft form, will be filed in a Plan Supplement prior to the confirmation hearing.

Facility") continue to provide advances, factoring and related financial accommodations to the Debtors, as reorganized, from and after their emergence from Chapter 11 under the Plan from and after the Effective Date.

13. The obligations, duties and liabilities of the Debtors to HCI under the Post-Petition Funding Facility will not be discharged or released under the Plan; rather, those obligations, liabilities and duties will survive the Effective Date and will be assumed by the Reorganized Debtors pursuant to the Ratification, Assumption and Amendment Agreement and such obligations, liabilities and duties, as so ratified, assumed and amended therein, shall constitute the legal, valid and binding obligations, liabilities and duties of the Reorganized Debtors, enforceable against them, in all respects.

14. Subject to Court approval, the Debtors have accepted a letter of intent, which evidences and describes, subject to the terms thereof, the proposed base terms of the Exit Funding Facility (the "Letter of Intent" or, variously, the "LOI"). A copy of the proposed Letter of Intent is attached hereto as <u>Exhibit A</u>. Although the terms concerning the proposed Exit Funding Facility are summarized more fully in the attached Letter of Intent, whose terms are incorporated by reference and govern, the following provides a brief overview thereof.

15 The Letter of Intent proposes, once the Exit Funding Facility closes, that the Debtors will, from and after the Effective Date, sell their eligible healthcare receivables to HCI (the "Factor"), free and clear of liens, claims, interests and encumbrances pursuant to the Purchase Agreement, as that agreement is ratified, assumed and modified by the Ratification, Assumption and Assignment Agreement. The Exit Funding Facility will also extend the maturity date of the Post-Petition Funding

Facility until December 31, 2010, or such later date as HCI may agree to, from time to time.

16.     The Letter of Intent also reflects a proposed maximum funding limit of $4,500,000 under the Exit Funding Facility, pursuant to the terms and conditions thereof.

17.     The Letter of Intent also provides, with respect to the Exit Funding Facility, that the obligations and indebtedness of the Reorganized Debtors to HCI will continue to be secured by a pledge of non-purchased accounts, credit balances and substantially all other assets of the Reorganized Debtors (subject, however, to senior liens granted in certain collateral to HUD and the FHA Mortgagees on the Effective Date of the Plan, under the terms of an Intercreditor Ageement) and by collateral pledged by Benjamin Fischman and Sam Strasser, the Debtors' CEO and COO, and by Affinity Health Care Management, Inc., all guarantors.  Affinity Health Care Management and Messrs. Fischman and Strasser will issue new Validity Guarantees to the Factor in respect of the Exit Funding Facility and they will also remain bound by their existing Validity Guarantees with respect to the Post-Petition Funding Facility.[4]  The Letter of Intent contemplates that the Debtors and the Reorganized Debtors will be obligated, jointly and severally, to pay HCI an Origination Fee when the Exit Funding Facility closes on the Effective Date, in the amount of $112,500 (2.5% of the $4.5 million Maximum

---

[4] Messrs. Fischman and Strasser have agreed to grant HCI, as collateral for their new Validity Guarantees, a "frozen" junior lien on the equity interests (LLC membership interests and stock) that they own in the various landlords of the Alexandria, Blair and Douglas Providers, which equity interests are being pledged to Housing & Healthcare Finance, LLC, a Delaware limited liability company (HHF) as part of the HUD settlement.  HCI has agreed, in turn, to allow HHF to receive a frozen junior lien, subordinate to HCI's lien, on the equity interests (LLC membership interests and stock) of Messrs. Fischman and Strasser in the Alexandria, Blair and Douglas Providers, in their respective capacities as Reorganized Debtors.

Case 08-22175   Doc 796   Filed 05/06/10   Entered 05/06/10 11:59:03   Desc Main
Document      Page 8 of 18

Facility Amount), of which sum 2.0% ($90,000) will be immediately due and payable and the $22,500 (.5%) balance will be spread over the next four (4) fundings.

18.     Upon exit from Chapter 11, proceeds of the sale of accounts to HCI under the Exit Funding Facility, and advances by HCI against the same, will be used by the Reorganized Debtors (i) to provide financing for working capital, capital expenses and other general corporate purposes, subject to the terms and conditions of the Exit Funding Facility; (ii) refinance any indebtedness and obligations due by the Debtors under the Post-Petition Funding Facility; (iii) make certain payments contemplated by the Plan in respect of pre-petition and post-petition claims, and (iv) pay related transaction costs, fees and expenses.

19.     The Exit Funding Facility will contain terms and conditions customary for transactions of this nature.  Conditions precedent to closing on the Exit Funding Facility, as set forth more fully in the Letter Of Intent include, among other things, (i) confirmation of the Plan; (ii) entry of both the Plan Confirmation Order and an Order approving this motion (the "Exit Funding Facility Motion"), each in form and substance satisfactory to HCI; (iii) the completion of the final documentation for the Plan and for the Exit Funding Facility, including the terms of the Ratification, Assumption and Amendment Agreement, to HCI's satisfaction, and the execution of all documents and instruments called for by the Exit Funding Facility and the satisfaction of all conditions precedent to funding thereunder; (iv) no occurrence of any defaults under the Post-Petition Funding Facility, between now and the Effective Date; (v) no challenge to the validity, extent, allowance, perfection or enforceability of the Post-Petition Funding Facility nor to the proposed Exit Funding Facility,  nor to the related claims, security interests, liens and rights of HCI

(and its assignor, HCRFSPC) thereunder; (vi) full and timely payment of all fees and expenses required by the Letter Of Intent and the Exit Funding Facility Documents, (vii) the subsequent successful restructuring, post-confirmation, by HUD and by the various mortgagees, of mortgage indebtedness owed by the various Provider landlords, coupled with contemporaneous savings and related rent concessions granted by such landlords to the Reorganized Debtors, for the term of the Plan, in order to reduce rents now payable by the Debtors to the reduced rents to the paid by the Reorganized Debtors as reflected in the projections of the operating results of the Reorganized Debtors, post the Effective Date, attached to the Disclosure Statement, and (viii) HCI receiving a frozen subordinate lien on the LLC and stock interests of Messrs. Fischman and Strasser in the landlords of the Alexandria, Blair and Douglas Providers, as noted in footnote 3, above.

20.    The Letter of Intent requires the Debtors and the Reorganized Debtors to reimburse certain costs and fees to HCI in connection with the contemplated Exit Funding Facility, including a nonrefundable deposit of $50,000 against the expenses and attorneys' fees to be incurred by HCI (collectively, the "Costs").  All legal fees payable by HCI with respect to preparation of the Exit Funding Facility documents, as well as for legal services rendered with respect to the Post-Petition Funding Facility, will be subject to Court approval, on due fee applications to be submitted by HCI within sixty (60) days of the Effective Date of the Plan.

21.    HCI will continue to purchase accounts from the Providers, as Reorganized Debtors, after the Effective Date of the Plan, on a nonrecourse basis, with credit risk passing to HCI, as is the case under the DIP Funding Facility now in place.

Accounts sold on such a basis are sold in a "true sale."  See e.g. See e.g. Matrix International Textiles, Inc. v. Jolie Intimates, Inc., 801 N.Y.S. 2d 236 (N.Y. Civ. Ct. 2005) at *3:

> The core of the Factoring Agreement, however, is SunTrust's purchase from Matrix or "certain receivables created by [Matrix's] sale of goods to…customers approved by" SunTrust, clearly including Jolie.  (See P1).  *The purchase and sale of accounts is "without recourse to [Matrix] for insolvency or nonpayment,* after the goods…have been actually delivered to and finally accepted without claim or dispute by [Matrix's] customer."  See Id. …
> …
> *[A]ll of the evidence points to a sale of the accounts without recourse and SunTrust's ownership and control of the account….*

(emph. added).

22.   A "true sale" was also found, where credit risk passed to the factor, in Girocredit Bank Aktiengesellschaft Der Sparkassen v. Focus Shoes, Inc., 1998 WL 867390, No. 97 Civ. 452 (RPP) (S.D.N.Y. Dec. 14, 1998).

23.   The fact that quality risk remains with the Reorganized Debtors, if purchased accounts are disputed or are otherwise charged-back, for reasons not rooted in credit risk, does not mean the subject sale of accounts to HCI is not a true sale (as the Court has properly found in prior Orders).  See e.g. United Virginia Factors v. Aetna Casualty and Surety Co., 624 F. 2d 814 (4th Cir. 1980).  There, the court held that a factor's loss incurred on its purchase of fictitious accounts was not excluded from coverage under the "loan" exclusion of the defendant's blanket bond, because the subject transaction was a true sale of accounts:

> *Factors purchased these accounts without recourse, and if the customers failed to pay Factors was required to bear the loss.*  Clients did, however, warrant to Factors that each

> account was a bona fide existing obligation, and if an account assigned to Factors was not paid because the account was not bona fide, Clients were obligated under the agreement to repay the amounts advanced with interest…In 1976, Clients sold and assigned to Factors certain accounts receivable which were wholly fictitious…
>
> *We agree with Factors and the district court that these transactions did not qualify as loans subject to exclusion from coverage under section 2(e)(1).* The flaw in Aetna's position on this point is that it would convert any fraudulent transaction into a loan, and the courts have consistently rejected such an argument…
>
> *Nor does the fact that the agreement gave Factors an express right to recover from Clients the amounts paid on spurious invoices change the nature of these transactions. While it is true that the invoices assigned to Factors carried a warranty from the Clients that they represented bona fide existing obligations, the right of Factors to recover for a breach of such warranty was merely a contingent contractual right incident to the purchase and could not convert the transaction into a loan.*

624 F.2d at 815-816 (emph. added).

24. Exit financing to Chapter 11 debtors is, on occasion, provided, in whole in part, by commercial and healthcare factors such as HCI. For example, in the jointly administered bankruptcy of <u>In re Glenoit Corporation</u>, Case No. 00-3309 (RB) (Bankr. D. Del.), Capital Factors, Inc. served as pre-petition factor to one of the jointly administered debtors, Ex-Cell Home Fashions, Inc. ("Ex-Cell"), under a Factoring Agreement dated October 16, 1990, as thereafter amended. Pre-petition, GMAC Commercial Credit, LLC, a second factor, itself factored the accounts of another one of the affiliated debtors, Glenoit Corporation. Both factors purchased accounts on a nonrecourse basis, accepting the credit risk on factor approved accounts, with all other accounts being purchased at the client's risk.

25. On August 8, 2000, Ex-Cell, Glenoit and the other affiliated debtors filed for relief under Chapter 11. Post-petition, Ex-Cell continued to sell accounts to Capital Factors, Inc., and Glenoit continued to sell accounts to GMAC Commercial Credit, LLC, in each case under an August 29, 2000 Final Order Authorizing Continued Factoring of Certain Accounts Receivable In the Ordinary Course of Business, Granting Senior Liens And Administrative Priority Expense Status And Authorizing Debtor To Enter Into Factoring Agreement Ratification With GMAC Commercial Credit, LLC and Capital Factors and the terms of an associated Ratification And Amendment Agreement, dated August 8, 2000, the petition date.

26. The Debtors' July 26, 2002, Disclosure Statement noted that GMAC's factoring was discontinued in April, 2002 and, due to the nonrecourse nature of GMAC's purchase of accounts, the Debtors believed that no funds were due and owing to GMAC and that it was anticipated that GMAC's proof of claim would be withdrawn. As to Capital Factors, however, the Disclosure Statement noted that "With respect to Capital Factors, Ex-Cell Home Fashions has continued to factor its receivables to that entity throughout this case, and its expects to do so post-confirmation." The Disclosure went on to say that Capital Factors had a contingent, secured, un-liquidated administrative claim for amounts due to Capital Factors as of the confirmation date, presumably in respect of unsatisfied charge-backs and fees and expenses due to the factor.

27. Capital Factors filed an Objection to confirmation of the Debtors' Second Amended Joint Plan of Reorganization, because it failed to provide for the continuation of the factoring by Capital Factors of the reorganized debtor and failed to expressly

provide that nothing in the plan primed or gave any party a security interest in accounts similar to the interests of Capital Factors therein.

28. Ultimately, the Order Confirming Debtor's Second Amended Joint Plan of Reorganization stated, in paragraph 11, that notwithstanding anything in the Order, the Plan, the Plan Documents, or any other documents ancillary to the Plan to the contrary, (i) the Factoring Agreement dated October 16, 1990 between Ex-Cell and Capital Factors, Inc. ("Capital Factors") (as amended) (the "Factoring Agreement") shall remain in full force and effect through December 31, 2002 (the "Termination Date") and Ex-Cell and Capital Factors shall continue to perform their respective obligations under the Factoring Agreement through the Termination Date, and (ii) the Ratification and Amendment Agreement dated August 8, 2000 (as ratified and amended) would remain in full force and effect, as would the security interests granted by Ex-Cell to Capital Factors, until the factoring agreement, as so ratified and amended, terminated post-confirmation, after all obligations thereunder were satisfied.

## **RELIEF REQUESTED**

29. By this Motion, the Debtors are seeking approval of their entry into the Exit Funding Facility and the related instruments and documents, including the Letter Of Intent, and to incur the duties and obligations to HCI thereunder prior to confirmation, including authority to pay the non-refundable deposit.  Approval of the Court under §105, 363(b), 1129 and 1142 of the Bankruptcy Code is sought because the Debtors' entry into the Letter of Intent with respect to the Exit Funding Facility is outside the ordinary course of the Debtors' business.

30. The Debtors have filed this Motion and will also file an order for shortened notice due to the fact that the hearing on confirmation is scheduled for May 12, 2010

and the Motion concerning approval of the Letter of Intent should be approved on or before that time.  The Debtors submit that the Exit Funding Facility will help give creditors cause to believe in the Debtors long-term viability, which will certainly facilitate the imminent reorganization process.  Accordingly, time is of the essence with respect to approval of the Debtors' entry into the Letter of Intent and authorization to pay the Origination Fee and Costs.

## **DISCUSSION**

31.  In the exercise of their sound business judgment, the Debtors have determined that the Exit Funding Facility contemplated by the proposal Letter Of Intent contains terms and conditions for their exit funding that are reasonable in the circumstances and as favorable as any other terms available in the marketplace.  The letter of intent was negotiated by the parties in good faith and, pursuant to such proposal, the Debtors have agreed to proceed in earnest to obtain Court approval of their entry into the Letter Of Intent, and the related payment of the fees and expenses contemplated therein.  However, the Exit Funding Facility cannot be documented and closed absent the same.

32.  The success of the Debtors' reorganization efforts in their proceeding is dependent upon having adequate financing to confirm the Plan and consummate the Debtors' reorganization.

33.  Pursuant to the Exit Funding Facility contemplated by the Letter of Intent, HCI shall continue, from and after the Effective Date, to purchase and fund the eligible accounts receivable of the Providers, in their capacities as Reorganized Debtors, on a regular basis, which accounts are paid principally by commercial insurance carriers, managed care companies, Blue Cross/Blue Shield, governmental contracts and/or

Medicare and Medicaid, upon certain terms and conditions, and on the funding limits, as summarized and contemplated in, and on the terms set forth in, the Letter of Intent.

34. As set forth above, the Letter of Intent requires the Debtors to pay the Origination Fee plus the Costs, which obligations, to the extent not paid by the Debtors, prior to the Effective Date, will be assumed by the Reorganized Debtors. The Origination Fee and the Costs called for by the Letter Of Intent, are expenses to be incurred by the Debtors outside the ordinary course of its business. Accordingly, the Debtors request that this Court approve payment of the Origination Fee and the Costs called for by the Letter of Intent.

35. There is ample support for the payment of expenses and attorney's fees required by a prospective post-petition financier of the Debtors, whether a factor, as here, or a lender. *See* In re Integrated Resources, Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd* 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2nd Cir. 1993). In Integrated Resources, the debtor sought court approval to enter into a break-up fee and expense reimbursement arrangement with a party for proposed chapter 11 plan funding. The Court stated:

> [b]reak-up fees may take the form of paying the out-of-pocket expenses incurred in arranging the deal, including due diligence expenses . . ..

36. Similarly, in In re Bethlehem Steel Corp., 2003 WL 21738964 (S.D.N.Y. July 28, 2003) at *1, the Court authorized payment in the amount of $1.4 million to the steel worker' union pursuant to Section 363(b) of the Bankruptcy Code to "[u]ndertake the due diligence and analysis that will be required in order for (the union) to participate in discussions regarding the restructuring of the Company . . .."

37. Bankruptcy courts routinely approve the incurrence by debtors-in-possession of fees and costs in connection with exit financing facilities under the business-judgment standard, and find that such fees and expenses are allowed administrative claims under §503(b) of the Bankruptcy Code.  See e.g. In re Mirant Corp., et. al., Case No. 03-46590 DML (Bankr. N.D. Tex. May 13, 2005), DE #9764 ("entry into the Commitment Letter is is in the best interests of the Debtors' estates and creditors and represents a sound exercise of the Debtors' business judgment.")  See also In re Premier International Holdings, Inc., Case No. 09-12019 (CSS)  (Bankr. D. DE Dec. 18, 2009), DE #1235 (permitting payment of a 5% fee and expense reimbursement on a $450 million rights offering being proposed to fund the debtors exit from Chapter 11).

38. In this case, the payment of the fees and costs called for by the Letter of Intent, is warranted and necessary to allow the parties to proceed with what is required for the Debtors to secure the Exit Funding Facility.  Without the Exit Funding Facility in place, the Debtors' reorganization would be significantly impeded.

39. In addition, the Debtors believe that the terms and conditions of the Letter of Intent are fair and reasonable and that the Exit Funding Facility, once closed on the Effective Date, will  receivables based funding that will enable the Reorganized Debtors to successfully stay in business and be in a financial position to satisfy their Plan obligations.  The Debtors, therefore, requests that their entry into the Letter of Intent and the performance of their duties thereunder be ratified and approved.

### Effectiveness

40.  Rule 6004(h) of the Bankruptcy Rules provides that an "order authorizing the use, sale or lease of property is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  The Debtor requests that any order approving the Motion be effective immediately.

### Notice

41.  Notice of this Motion, and of the request for shortened notice thereof, has been provided by the Debtors to all creditors and parties in interest, including the Internal Revenue Service, the Connecticut Department of Social Services, The Department of Housing & Urban Development, The Center for Medicare And Medicaid Services and the United States Attorney.  The Debtor believes that no further notice is required or necessary.

### Memorandum of Law

42.  Because the legal points and authorities on which the Motion relies are incorporated herein, the Debtors submit that no separate memorandum of law is required.

### CONCLUSION

**WHEREFORE**, the Debtors respectfully requests that this Court enter an Order: (A) Approving their entry into the Letter of Intent and the other documents and instruments called for by the Exit Funding Facility, and their performance of the obligations and duties to HCI thereunder, and authorize the payment of the non-refundable due diligence deposit of $50,000 and (B) Granting the Debtors such other and further relief as may be appropriate under the circumstances, but with the

understanding that no accounts will be sold by the Reorganized Debtors to HCI under the Exit Funding Facility, nor will collateral be pledged to HCI thereunder, until after both Plan Confirmation and consummation of the Plan, on the Effective Date thereof.

Dated: May 6, 2010

        Pullman & Comley, LLC
        Attorneys for the Debtors
        AFFINITY HEALTH CARE MANAGEMENT, INC., ET AL

        By: /s/ Elizabeth J. Austin
           Elizabeth J, Austin (ct04383)
           Jessica Grossarth (ct23975)
           Pullman & Comley, LLC
           850 Main Street, P.O. Box 7006
           Bridgeport, CT 06601-7006
           (203) 330-2000  Fax: (203) 576-8888
           eaustin@pullcom.com
           igoldman@pullcom.com
           jgrossarth@pullcom.com

ACTIVE/72743.1/EA/770876v2