# EXHIBIT 3

# PLAN OF ORGANIZATION

# STATE SETTLEMENT AGREEMENT

## COMPROMISE AND SETTLEMENT AGREEMENT

This **COMPROMISE AND SETTLEMENT AGREEMENT** (the "Agreement") is entered into by Affinity Health Care Management, Inc. ("Affinity"), Health Care Investors, Inc. d/b/a Alexandria Manor ("Alexandria"), Health Care Alliance, Inc. D/b/a Blair Manor ("Blair"), Health Care Assurance, L.L.C. d/b/a Douglas Manor ("Douglas"), and Health Care Reliance, L.L.C. d/b/a Ellis Manor ("Ellis") (collectively, the "Debtors"), the State of Connecticut Department of Social Services ("DSS") and the State of Connecticut Department of Revenue Services ("DRS"). The Debtors, DSS and DRS shall be collectively referred to herein as the Parties.

WHEREAS, On October 14, 2008 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under the Bankruptcy Code and the Debtors continue to operate their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Debtors proceedings are being jointly administered by orders dated October 22, 2008 and an order dated November 14, 2008;

WHEREAS, no trustee or examiner has been appointed and a committee of unsecured creditors has been appointed in these cases and Neubert Pepe & Monteith, P.C. has been retained as their counsel;

WHEREAS, the Debtors are a nursing home management company, Affinity, and four affiliated companies, Alexandria, Blair, Douglas, and Ellis, which operate four skilled nursing homes;

**WHEREAS**, the Debtors' landlords are affiliated entities, but are not debtors, and they include Alexandria Manor Associates, LLC, Blair Manor, LLC, Assurance Health Care Associates, LLC and Reliance Health Care Associates, LLC (the "Real Estate Entities");

**WHEREAS**, the United States Department of Housing and Urban Development ("HUD") holds mortgages on the property owned by the Real Estate Entities, which mortgages are in default by reason of the Debtors' inability to stay current on their rental payments;

**WHEREAS**, Benjamin Z. Fischman is the President, a shareholder, or a member of the Debtors, and Samuel Strasser is the Vice-President, a shareholder, or a member of the Debtors;;

**WHEREAS**, the Debtors have approximately 450 employees and approximately 220 of the Debtors' employees belong to the local chapter of the New England Health Care Employees Union ("Local 1199") and the Debtors' monthly payroll is approximately $1.65 million ($1.6 million for its employees and $50,000 for its officers and consultants);

**WHEREAS**, the Debtors have commenced their Chapter 11 cases to restructure their operations and to insure their long-term viability through a plan of reorganization subject to Court approval;

**WHEREAS**, the Debtors filed because they were unable to pay their debts as they were coming due for a multiplicity of reasons;

**WHEREAS**, to address their cash shortfalls, the Debtors have, since the Petition Date, implemented cost-cutting measures by implementing staffing reductions and consolidations, and restructuring or renegotiating contracts with vendors and service providers, all of which have resulted in substantial savings to the Debtors;

WHEREAS, despite the cost cutting measures taken, in order for the Debtors to emerge from Chapter 11, they need additional financial relief from the United States of America Internal Revenue Service (the "IRS"), Metro Exchange, LLC ("Metro"), HUD, DSS and DRS, all of which need to be addressed as part of any exit strategy and/or Chapter 11 plan of reorganization;

WHEREAS, by order dated November 19, 2009, the Court approved a settlement by and between the Debtors, Metro and the IRS, which resolved claims in excess of 4 million dollars asserted by Metro and the IRS against the Debtors in these cases (the "IRS/Metro Settlement");

WHEREAS, the IRS/Metro Settlement will be incorporated into the Joint Plan of Reorganization (the "Plan");

WHEREAS, on November 20, 2009, the Court granted the Debtors' motion to approve post-petition funding to be provided by Healthcare Capital, Inc. ("HCI") (the "HCI Motion");

WHEREAS, the Debtors closed on the funding on November 23, 2009 and the proceeds of the funding were used, in part, to fund the settlements reached with the IRS and Metro. Further, $100,000 from such funding has been escrowed to fund the initial payment due DSS as part of this Settlement Agreement;

WHEREAS, the Debtors, the Real Estate entities, and certain equity interest holders in both the Operating Entities and the Real Estate Entities, have negotiated a comprehensive settlement with HUD, which once finalized and approved will not only result in substantial rent savings to the Debtors but will provide funds to the Debtors to assist with the Reorganization process (the "HUD Settlement"). The Debtors will seek approval of the HUD Settlement through the plan confirmation process;

WHEREAS, DSS has asserted a secured claim in the Debtors' cases totaling $3,998,948 for Medicaid Recoupment (the "Recoupment Claim");

WHEREAS, DRS has asserted an unsecured priority claim against the Debtors for non-provider taxes in the amount of $399,064.20, consisting of $380,448.15 in principal and $18,616.05 in interest (the "DRS Claim") and an unsecured non-priority claim for penalties in the amount of $14,838.46;

WHEREAS, the Debtors have reached a settlement with DSS and DRS (DSS and DRS shall be collectively referred to herein as the "State"), as summarized in the accompanying motion to approve the settlement (the Motion") and set forth in more detail below, which once approved will result in a substantial reduction of DSS' secured claim and will provide for financial safe guards that will ensure cost effective and efficient operations going forward;

NOW, THEREFORE, in consideration of the mutual promises and agreements contained herein, the Parties hereby contract, covenant and agree, subject to approval by the Bankruptcy Court of this Agreement, as follows:

1. DSS shall waive the Recoupment Claim against the Debtors. Debtors shall not seek interim rates during the five (5) years commencing on July 1, 2010. Medicaid rates for Debtors facilities effective on the Effective Date of the Plan shall be prospective and not subject to cost settlement. The facility Medicaid rates effective on the later of (i) June 1, 2010 or (ii) the Effective Date of the Plan, shall be Alexandria $240.58, Blair $227.97, Douglas $234.88 and Ellis $218.81, unless legislation is adopted that decreases rates by a specified percentage effective prior to June 30, 2010. In such an event, the foregoing rates shall not apply and the Medicaid rates shall be computed by applying the statutory decrease to the rates in affect December 31, 2009; specifically Alexandria $241.61, Blair $230.12, Douglas $236.38 and Ellis $219.99. Medicaid rates effective on and after the Effective Date of the Plan shall be subject to applicable statutes and regulations. Medicaid rates for rate periods on or after the Effective Date

of the Plan shall be subject to applicable statutes and regulations, all in exchange for the following considerations to be provided by the Debtors.

2. The Debtors shall make a payment to DSS in the amount of $100,000 within three (3) days following the Effective Date of the Plan.

3. The Debtors shall pay DSS an additional $150,000, to be paid in twelve equal monthly installments commencing on August 1, 2010. Failure to make such payments shall be grounds for DSS to recoup the amount due from the following months Medicaid payment subject to limitations on the amount and notice of recoupment that have been approved by the orders of the Bankruptcy Court.

4. The Debtors shall hire a Chief Financial Officer subject to the terms and conditions which are set forth on the Exhibit "1" annexed hereto. Debtors shall comply with all provisions of Exhibit 1 and hereby grant the Chief Financial Officer all authority necessary to fulfill the duties and responsibilities of said position as set forth in Exhibit 1.

5. Benjamin Z. Fischman, the Debtor's President and Chief Executive Officer and Samuel Strasser, the Debtor's Vice President of Operations, may remain in these roles post-confirmation. The salary of Mr. Fischman will be reduced to $220,000 per year and the salary of Mr. Strasser shall be reduced to $145,000 per year and personal business expenses, inclusive of insurance and/or pension benefits, shall be capped at $50,000. Said salaries will remain in effect for a two (2) year period at which time the Chief Financial Manager will review for the purposes of determining whether there should be an adjustment.

6. The Debtors shall pay the balance due on the pre-petition Provider taxes in full on a quarterly basis over a two (2) year period, with the first payment commencing on July 31, 2010 plus interest at the rate of 12% per annum. Failure to make such payments shall be grounds for

DRS to instruct and authorize DSS to set off the amount due from the Medicaid payments due the Debtors.

7.  The Debtors shall pay the pre-petition pension fund liability in full on a monthly basis over a five (5) year period with the first payment commencing on July 15, 2010.

8.  The Debtors shall electronically deposit with DRS, on a weekly basis, the full amount due for such week's provider taxes, which funds will be applied by DRS to the Debtors' prospective provider tax liabilities.

9.  If there is a shortfall in the amounts available to pay either current provider taxes as required under paragraph 7 or current non-provider taxes, DRS shall authorize DSS to setoff with respect to same, up to $10,000 per month, with any setoff exceeding such sum to be taken by DRS ratably over six (6) months time. DRS shall give HCI contemporaneous notice of any taxes due and not paid by the Operating Entities. DRS shall also give the Debtors ten (10) business day cure period following such notice.

10. The Debtors shall maintain any and all records associated with Crescent Manor for a period of three (3) years. Thereafter, the Debtors may dispose of the records, in a manner consistent with the applicable health care regulations and consumer privacy laws.

11. The adversary proceeding entitled <u>Affinity, et al v. The State of Connecticut</u>, Adv. Proc. No. 08-2062, shall be withdrawn, with prejudice, once the Order Approving Agreement becomes final.

12. The Debtors shall pay to DRS, in equal quarterly installments commencing on July 31, 2010 and continuing each quarter thereafter for a period of five (5) years, its pre-petition claim for non-provider taxes in the amount of $401,214.20, consisting of $382,418.15 in

principal and $18,796.05 in interest, plus interest at the rate of 12% per annum (the "DRS Claim").

13. The DRS shall waive its unsecured non-priority claim for penalties in the amount of $14,838.46.

14. DRS agrees to waive any and all penalties assessed or to be assessed, against the Debtors during the post-petition/pre-confirmation period by reason of the Debtors failure to make the provider tax payments electronically, and the Debtors will take the appropriate steps to submit the appropriate waiver documents once any such bills are received by the Debtors.

15. The State of Connecticut, its departments and agencies, including but not limited to the DSS and DRS, affiliates, predecessors, agents, employees, successors and assigns, are hereby unconditionally released and discharged from any and all claims (as defined in section 101(5) of the Bankruptcy Code) (whether scheduled or filed), demands, obligations, actions, causes of action (including, but not limited to, any causes of action arising under or related to Chapter 5 of the Bankruptcy Code), suits, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, costs, losses, debts, expenses and liabilities of any kind, including, but not limited to rights of recoupment or setoff (under any legal or equitable theory, whether contractual, common law, statutory, regulatory, federal, state, local or otherwise, and including, but not limited to, claims for fees, costs an disbursements of any kind), whether known or unknown, suspected or unsuspected, fixed or contingent, apparent or concealed, which the Debtors on behalf of themselves, parents and subsidiaries, past and present officers, managing members, employees, shareholders, agents and assigns, any successor to the Debtors, the Committee and its counsel

and agents, and parties-in-interest, now have, ever had, or hereafter may have, against the State of Connecticut from the beginning of time up to and including the Effective Date.

16. In the event of a default by the Debtors of any of the Agreement's terms, DSS reserves the right to trigger enforcement penalties, such as the implementation of a prospective rate penalty and recovery of the amounts in the Recoupment Claim as permitted under state law and the Medicaid Provider Agreement, subject to Orders of the Court limiting DSS recoupment or setoff of recoveries.

17. It is understood and agreed that this Agreement shall be binding upon and shall inure to the benefit of the Debtors, DSS and DRS only, and that there are no third party beneficiaries to this Agreement.

18. Subject to obtaining Bankruptcy Court approval of this Agreement, each party to this Agreement represents and warrants that its execution, delivery and performance of the Agreement have been duly and validly authorized by all necessary corporate action.

19. Each and every provision of this Agreement has been mutually negotiated, prepared and drafted. Each party thereto has been represented by legal counsel or had the opportunity to be represented by legal counsel. In connection with the construction or interpretation of any provision hereof or deletions herefrom, no consideration shall be given to the issue of which party actually prepared, drafted, requested or negotiated any provision or deletion. The Agreement shall not be construed more severely against one party hereto or any other party hereto.

20. Notwithstanding anything to the contrary herein, this Agreement shall not become effective until the Bankruptcy Court confirms the Plan and as a part of such confirmation order

approves this Agreement and the Debtors fulfill all conditions precedent to the occurrence of the Effective Date of the Plan.

    **IN WITNESS WHEREOF,** the parties have executed this Agreement on this ____ day of April, 2010.

| | |
|---|---|
| **AFFINITY HEALTHCARE MANAGEMENT, INC., ET AL** | **STATE OF CONNECTICUT, DEPARTMENT OF REVENUE SERVICES** |
| By:_____<br>  Ben Fischman<br>  Its :<br>  President | By: _____<br>  Denise Mondell, Esq.<br>  Assistant Attorney General<br>  Office of the Attorney General |
| **Health Care Investors, Inc., d/b/a Alexandria Manor** | **STATE OF CONNECTICUT, DEPARTMENT OF SOCIAL SERVICES** |
| By:_____<br>Its _____ | By: _____<br>  Henry A. Salton, Esq.<br>  Assistant Attorney General<br>  Office of the Attorney General |
| **Health Care Reliance, Inc., d/b/a Blair Manor** | |
| By:_____<br>Its _____ | |
| **Health Care Assurance, LLC, d/b/a Douglas Manor** | |
| By:_____<br>Its _____ | |
| **Health Care Reliance, LLC., d/b/a Ellis Manor** | |
| By:_____<br>Its _____ | |

ACTIVE/72743.5/JXG/802598v2

9

## EXHIBIT 1

## Terms for Retention of CFO

*A.   Hiring, Term and Compensation*

1. The Debtors will hire, subject to DSS and HUD's approval a Chief Financial Officer/Manager ("CFO") for the Reorganized Entities.

2. The initial term of the CFO Contract will be five (5) years, provided, however, that after three (3) years with DSS's participation, the Debtors will conduct a performance review of the CFO to insure that the CFO is fulfilling all duties, and if not, the Debtors, with DSS's approval, will take the appropriate steps to address same, including, if necessary, termination for cause, at which time a new CFO will be selected subject to the approval of DSS and HUD. At the end of the five (5) year term, the CFO's contract will either be renewed for an additional three years, subject to the consent and approval of HUD and DSS. Three years into the term of the second five (5) year contract, the Debtors will conduct a performance review to once again insure that the CFO is fulfilling all duties and, if not, the Debtors with DSS approval, will take the appropriate steps to address same, including, if necessary, termination for cause, at which time a new CFO will be selected subject to the approval of DSS and HUD. The initial five (5) year term will commence on the Effective Date of the Plan.

3. The CFO may be terminated for cause, with the approval of DSS and HUD. In the event the CFO is terminated, quits or is otherwise unable to continue to serve as CFO, such CFO will be immediately replaced with a new CFO qualified to meet the requirements set forth herein, subject to the approval of DSS and HUD.

4. The CFO position will be funded through salary reductions of the existing management, and reductions in existing management staff, and will not increase the current cost for management at the Facilities. Upon selection of the person to fill the CFO position, the details of the time spent by the CFO in fulfilling the duties and responsibilities set forth below, and compensation will be negotiated and set based on these expectations, and will be subject to the approval of DSS and HUD. Any increases to the CFO's compensation must be approved by DSS and HUD.

5. The Debtors will obtain coverage in the form of errors and omission or directors and officers liability insurance to cover the acts of the CFO, and if such insurance is not available, the CFO will obtain a bond in the appropriate amount, and such bond shall be paid by the Debtors.

**B.     *CFO's Duties and Responsibilities***

    1.     Provide overall financial management of the operations of the Debtors to insure adherence to the Plan (as that term is defined in the Settlement Agreement), preserve the overall financial integrity of operations and report to appropriate DSS and Federal agencies.

    2.     Have sole authority and responsibility for interacting with DSS on all rate issues.

    3.     Review and determine cash disbursements to be made and make sure rent, payroll, payroll taxes, provider taxes, employee and union pension and benefit payments are made timely as well as all other vendor payments for goods and services.

    4.     Meet regularly with facility administrators, existing management company personnel and other appropriate facility personnel to review financial operations.

    5.     Establish policies and procedures for selection of vendors and providers of other goods and services and maintain authority to make final selection of same in accordance with prudent business providers.

    6.     Review, negotiate and approve all new or renewed contracts.

    7.     Review, approve and monitor all operating budgets, monthly closings, review of monthly results and improvements to financial operations, preparation of Federal and DSS income tax returns, Medicare cost reports and Medicaid costs reports.

    8.     Preparation of year end financial statements for the required annual audits of the real estate entities and interface with the debtor's outside auditing firm as well as compliance with all aspects of the HUD regulatory agreement.

    9.     Maintain authority to communicate with HUD and provide to HUD any financial reporting required by HUD.

    10.    Engage in other activities as deemed necessary to secure the continued profitable operations of the facilities in furtherance of the plan of reorganization.

    11.    Have sole authority and responsibility over the use and disposition of net revenues.