# EXHIBIT 4
# PART TWO

# PLAN OF REORGANIZATION

# RATIFICATION, ASSUMPTION AND AMENDMENT AGREEMENT

Event of Default (as defined in the Purchase Agreement) exists under the DIP Funding Facility, immediately prior to its replacement by the Exit Funding Facility, on the Closing under this Ratification Agreement, on the Effective Date of the Plan, and certificates from each Debtor waiving all claims and causes of action, whether in contract or tort, known or unknown, against HCI arising prior to the Effective Date, as to all matters, other than claims as to the balance payments due and owing under the terms and conditions of the DIP Funding Facility. There shall also be no challenge existing, as of the Effective Date, to the validity, enforceability, allowance or perfection of the DIP Funding Facility, the Exit Funding Facility, nor to the related claims, security interests, liens and rights received by HCI thereunder.

      **7.9**     Plan Confirmation and Exit Funding Facility Orders. The Plan Confirmation Order and the Exit Funding Facility Orders, each in form and substance acceptable to HCI, shall have been duly entered, and be valid, subsisting and continuing and not have been vacated, modified, reversed on appeal, or vacated or modified by any Bankruptcy Judge or District Court Judge, nor subject any pending appeal or stay, and the Effective Date of the Plan shall have occurred. The Plan Confirmation Order shall find that the sales of Accounts and the other Conveyed Property under the Exit Funding Facility constitutes "true sales" of such property to HCI.

      **7.10**     Conditions to Effectiveness of the Plan. HCI shall have received evidence, in form and substance satisfactory to HCI, that all conditions precedent to the effectiveness of the Plan and to the emergence of the Providers and the Lead Debtor from Chapter 11 (other than the condition of the exit funding to be provided by HCI on the terms hereof) have been satisfied.

      **7.11**     Projections/Pro-forma balance sheets and income statements. The Provider shall have delivered to HCI cash-flow financial projections for the first three (3) years after the Effective Date of the Plan, prepared in good faith, based on the assumptions thereon, acceptable to HCI, showing cash flows acceptable to HCI and establishing a reasonable likelihood of Provider's ability to successfully perform under the Plan as confirmed by the Bankruptcy Court, and associated projected pro-forma balance sheets and income statements, acceptable to HCI, from the Effective Date of the plan forward.

      **7.12**     No Material Adverse Changes. There shall have been no material adverse changes in the financial performance or condition of the Providers, as debtors-in-possession, or in capital markets, between the date of the initial provision of debtor-in-possession funding by HCRFSPC, under the Bankruptcy Court order entered November 20, 2009, as thereafter amended, from time to time, and the Effective Date. The Effective Date shall occur no later than June 15, 2010.

      **7.13**     Approval of CFO. HCI, in its sole discretion, shall have accepted and agreed with the chief financial officer selected by the Connecticut Department of Social Services, pursuant to the Plan.

      **7.14**     Agreement with Professionals. The Providers shall have obtained and delivered to HCI agreements with all Provider professionals to allow for the payout of outstanding professional fees to such persons, owed as of the Effective Date, through ratable equal monthly payments over fifteen (15) months time after the Effective Date, commencing August 1, 2009, with three (3) payments to be made in 2010 and twelve (12) payments to be made in 2011.

      **7.15**   <u>Modifications to Operating Agreements, Articles, and Shareholders Agreements of the Reorganized Debtors</u>.  The Providers shall have delivered to HCI such modifications to their Operating Agreements, Shareholders Agreements, Articles of Incorporation and other documents and instruments, as HCI may require, such that HCI shall have, if it forecloses the stock and LLC membership interests pledged to HCI by Messrs. Fishman and Strasser under the Exit Funding Facility, that are no less, in terms of voting, distributions, management and participation, than those held by Messrs. Fishman and Strasser pre-petition, and in all events such that other members and shareholders may not limit or impair HCI's legal privileges, beyond that, if any, under the Intercreditor Agreements between HCI and HHF, and rights in such stock and membership interests pledged to HCI in a manner which is not acceptable to HCI, and the Providers and their members and stockholders shall covenant not to make any efforts to later adopt any such restrictions which would impair HCI's enjoyment and rights in the stock and LLC interests so pledged to HCI.

      **7.16**   <u>Other documents</u>.  The Provider shall have delivered to HCI such other documents and instruments as HCI may require in connection with the Exit Funding Facility including, if required by HCI, a full Nonrecourse Healthcare Accounts Receivable Purchase Agreement, dated on the Effective Date, between Health Capital Receivables Administrative Corporation, as Purchaser, and the Reorganized Debtors, individually and collectively, jointly and severally, as Provider.

**8.**     <u>**RELEASE BY THE DEBTORS AND BY THE REORGANIZED DEBTORS**</u>

      In consideration of HCI's entry into the Exit Funding Facility, the Debtors and the Reorganized Debtors, jointly and severally, agree on behalf of themselves, and each of their respective past and present agents, principals, shareholders, members, assigns, predecessors, successors and all persons acting by, through, under or in concert with any of them, to release and discharge both HCRFSPC and HCI and each of their respective past and present officers, directors, employees, agents, principals, shareholders, assigns, insurers, reinsurers, attorneys, subsidiaries, parent companies, affiliated entities, predecessors, successors and all persons acting by, through, under or in concert with any of them, from, and relinquish and waive, in law and in equity, any and all suits, lawsuits, actions, debts, liens, contracts, agreements, promises, liabilities, claims, causes of action, acts, benefits, rights, rights of action, wages, compensation, demands, damages, sanctions, penalties, accountings, reckonings, obligations, losses, costs and expenses, whether under the law of any jurisdiction worldwide or in equity, whether known or unknown, fixed or contingent, suspected or unsuspected, of every nature and kind whatsoever, whether concealed or hidden, which exist or existed at any time prior to the Effective Date of the Plan, provided, however, that the Debtors and the Reorganized Debtors do not release their claims for balance payments due from HCI in respect of Purchased Accounts sold to HCI prior to the Effective Date, such balance payments to be credited to the Reorganized Debtors under the terms and conditions of the Purchase Agreement and the Exit Funding Facility.

**9.**     <u>**MISCELLANEOUS**</u>

      **9.1**   <u>Amendments and Waivers</u>. Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom

enforcement of the change, waiver, discharge or termination is sought.

**9.2** <u>Further Assurances.</u> Provider shall, at its expense, at any time or times duly execute and deliver, or shall cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, Uniform Commercial Code financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by HCI of all the rights and remedies hereunder, under the Factoring Agreement, the Exit Funding Order or applicable law with respect to HCI's rights in Purchased Accounts and other Conveyed Property, and in the Collateral, and do or cause to be done such further acts as may be necessary or proper in HCI's opinion to evidence, perfect, maintain and enforce the security interest and the priority thereof and to otherwise effectuate the provisions or purposes of this Agreement, the Factoring Agreement or the Exit Funding Order. Upon the reasonable request of HCI, at any time and from time to time, Provider shall, at its cost and expense, do, make, execute, deliver and record, register or file, financing statements, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or cause the same to be done) and will deliver to HCI such instruments as may be reasonably requested by HCI.

**9.3** <u>Headings</u>. The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

**9.4** <u>Counterparts</u>. This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.

**9.5** <u>Additional Events of Default</u>. The parties hereto acknowledge, confirm and agree that the failure of Provider to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by Provider in connection herewith shall constitute an Event of Default under the Factoring Agreement,

**9.6** <u>Costs and Expenses</u>. Provider shall pay to HCI on demand all reasonable costs and expenses that HCI pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Agreement and the Factoring Agreement and the Exit Funding Order, including, without limitation: (a) attorneys' and paralegals' fees and disbursements of counsel to HCI; (b) costs and expenses (including attorneys' and paralegals' fees and disbursements for both in-house and outside counsel) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Ratification Agreement, the Factoring Agreement, the Exit Funding Order and the transactions contemplated thereby, (c) the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of HCI in the Purchased Accounts, the other Conveyed Property, and in the Collateral; (d) sums paid or incurred to pay any amount or take any action required of Provider under the Factoring Agreement or the Exit Funding Order that Provider fails to pay or take: (e) cost of appraisals, inspections and verifications of the Collateral and including travel, lodging, and meals for inspections of the Collateral, and for review of Provider operation by HCI and its agent and to attend court hearings or otherwise in connection with the same; (f) costs and expenses of collecting checks and other

items of payment, and establishing and maintaining payment accounts and lock boxes; (g) costs and expenses of preserving and protecting HCI's rights under the Factoring Agreement and the other documents comprising the Exit Funding Facility; and (h) costs and expenses (including attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment or otherwise enforce HCI;s rights in or realize upon the Collateral, and otherwise enforce the provisions of this Agreement, the other Factoring Agreement and the Exit Funding Order, or to defend any claims made or threatened against HCI arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters). The foregoing shall not be construed to limit any other provisions of the Factoring Agreement and the other documents comprising the Exit Funding Facility. All sums provided for in this Section 9.6 shall be part of the Obligations owed to HCI under the Factoring Agreement, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Factoring Agreement.

**9.7** <u>Effectiveness</u>. This Ratification Assumption and Amendment Agreement shall become effective upon the execution hereof by HCI, entry of the Exit Funding Facility Order and the Plan Confirmation Order, and the occurrence of the Effective Date under the Plan.

[Signatures on Following Pages]

**IN WITNESS WHEREOF**, intending to be legally bound hereby, the parties have set their hands as of the day and year set forth above.

        HEALTH CARE INVESTORS, INC., a Connecticut corporation, dba Alexandria Manor, as reorganized debtor

        By: _____
         Name:
         Its:

        HEALTH CARE ALLIANCE, INC., a Connecticut corporation, dba Blair Manor, as reorganized debtor

        By: _____
         Name:
         Its:

        HEALTH CARE INVESTORS, INC., a Connecticut corporation, dba Alexandria Manor, as reorganized debtor

        By: _____
         Name:
         Its:

        HEALTH CARE ASSURANCE, LLC., a Connecticut limited liability company, dba Douglas Manor, as reorganized debtor

        By: _____
         Name:
         Its: Manager

DC:2335073v1

HEALTH CARE RELIANCE, LLC., a Connecticut limited liability company, dba Ellis Manor, as reorganized debtor

By: _____
    Name:
    Its: Manager

AFFINITY HEALTH CARE MANAGEMENT, INC., a New York corporation, as reorganized debtor

By: _____
    Name:
    Its:

HEALTH CAPITAL RECEIVABLES FUNDING ADMINISTRATIVE CORPORATION, a New York corporation

By: _____
    Name: Steven B. Nitsberg
    Its: President

APPENDIX A

TERM SHEET

**Healthcare Providers:**    The Providers as identified in the Ratification Agreement.

**Funding Facility Amount**: Four Million Five Hundred Thousand Dollars ($4,500,000), among all Providers, combined, to be disbursed on a purchase basis. The size of the Funding Facility Amount may be increased based upon an increase of the Providers' Eligible Accounts Receivable, to be verified by HCI, in HCI's sole discretion.

**Program Overview**: HCI shall, in its good faith and sole discretion, from and after the Providers' emerging from bankruptcy pursuant to the Plan, purchase and fund eligible accounts receivable which are payable by Commercial Insurance Carriers, Managed Care companies, Blue Cross/Blue Shield, State/County/Federal Contracts, Medicare, and/or Medicaid. The Providers are responsible for supplying any and all documentation necessary to enable HCI to determine the purchase price of the accounts receivable as defined below. Under the Exit Funding Facility, it is contemplated that HCI will, in its discretion, on the terms of the Purchase Agreements, purchase substantially all eligible accounts of the Providers. The sale of accounts and of related conveyed property to HCI will be free and clear of all liens, claims, interests and encumbrances existing as the date of sale. After its initial funding, on or about the effective date of the Plan, HCI will thereafter, in its discretion, continue to purchase new eligible accounts receivables arising from the Providers' delivery of healthcare services thereafter, on a weekly, bi-weekly or monthly basis.

**Term**: The Exit Funding Facility, as it may be later extended or amended, will initially be made available to the Providers for a period which ends on December 31, 2010, unless further extended, in HCI's sole discretion. HCI commits, on the terms of this Ratification, Assumption and Amendment Agreement, at no further origination fee, to a further additional term to bring the term to twelve (12) months (including the initial term aforesaid), provided that (a) the variance between (i) the actual cumulative operating cash flows for June 1, 2010 through December 31, 2010, as compared to the cumulative operating cash flows for such period in the latest projections provided to HCI on April 26, 2010, do not vary adversely by more than 7.5% from the latest projections so provided to HCI (provided, however, that further capital contributions by Ben Fischman and Sam Strasser during such period, above those shown in the projections given to HCI on April 26th, shall be treated as operating cash flow for this purpose) and (ii) the ending cash balance on December 31, 2010, as compared to the projected ending cash balance at that time, do not vary adversely by more than 5%; (b) there has been no prior default under nor any default then existing in the Exit Funding Facility and (c) there is no material increase (15% or more) in the amount and aging of trade payables, as to any age category (current, 30-day, 60-day, 90-day and over 120-days) at the end of the term ending December 31, 2010, compared to the aging and amount of trade payables on April 27, 2010.

**Use of Proceeds**: To provide funding, together with capital contributions by the existing equity holders of the Debtors, for emergence of the Providers from bankruptcy, to make payments under the Plan, and to provide working capital on a going forward basis to the Providers to fund

DC:2335073v1

daily business operations.

**Eligible A/R**: All Accounts Receivable which have not reached their respective bar dates for billing and collection which are owed by the following payors: Commercial Insurance payors, HMO/PPOs, Blue Cross/Blue Shield, Medicare, Medicaid, and/or State/County/Federal Governmental Contracts (all of the foregoing hereinafter defined, collectively, as "Third Party Payors" or, variously, "Payors").

**Ineligible A/R**: Accounts Receivable, which are disputed, or are the subject of defenses, set-offs or counterclaims, self-pay accounts, and any invoices which contain a gross invoice size of less than $50, at the time of billing.

**Purchase Price**: The Purchase Price for each Proposed Account shall equal 100% of the aggregate of the expected payments from the Payor (the "Net Realizable Value") of the Proposed Account(s), net of HCI's discount fees. The Net Realizable Value ("NRV") with respect to an Account shall mean the gross amount billed to the applicable Third Party Payor (obligor) by the applicable Provider less anticipated contractual allowances and discounts taken, available or extended by the Payor, whether taken or not, and credits or deductions of any kind allowed or granted to or taken by the Payor, and, if applicable, a dilution factor, all of which shall be determined in HCI's discretion and agreed upon by Provider, evidenced by its execution of Bills of Sale, and represents the amount reasonably anticipated by HCI to be collected on the Purchased Account from the Payor (excluding any amounts paid directly by patients), determined based on actual collection experience.

Unless the Provider is in default, upon collection of the Purchased Account(s) and occurrence of the Batch Closure Date HCI shall credit to the Provider the excess of the collections received over (i) the initial Advance on the Batch, at its purchase; (ii) the discount fees; (iii) additional fees and costs due to HCI by the Providers (if any) and (iv) any required Reserve additions (if any). For this purpose, the "Batch Closure Date", which is for purposes of calculating discount fees and reserve releases, means, as to each Batch of Purchased Accounts (the "Batch"), the date when HCI has recovered an amount equal to the Advance on the respective Batch.

**Advances**: HCI will advance, on a weekly, bi-weekly or a monthly basis, in its discretion, an amount equal to 80% of the NRV of the Purchased Accounts, as a payment against the full Purchase Price of the subject accounts. HCI may increase the advance rate based upon the collections performance of the funded accounts receivable.

**Reserve**: The Reserve maintained on HCI's books shall be a bookkeeping account, only. Advances and other purchase price payments, together with discount fees and other fees, costs and expenses due to HCI hereunder, including those arising from charge-backs, may be charged (debited) to the Reserve. The Reserve shall be credited with the Purchase Price and with collections on non-factored funds, such credits being disbursed as noted above.

**Reserve Requirement**: Twenty percent (20%) of the outstanding aggregate uncollected Advances on Purchased Accounts with respect to all open Batches.

**Discount Fees:**   The following monthly discount fees will be applied to the Net Realizable Value of open accounts receivable batches funded by HCI:

For any HCI funded accounts receivable batches which, contain an average <u>gross invoice size</u> of <u>greater than $1,250</u>:

| HCI's Monthly Advances: | Discount Fee: |
|---|---|
| Less than or Equal to $350,000 | 1.75% |
| Greater than $350,000 And Less than $500,000 | 1.675% |
| Greater than $500,000 And Less than $1.75 Million | 1.50% |
| Greater than $1.75 Million And Less than $3.5 Million | 1.45% |
| Greater than or Equal to $3.5 Million | 1.39% |

For any HCI funded accounts receivable batches, which contain an average <u>gross invoice size</u> of <u>less than $1,250</u>:

| HCI's Monthly Advances: | Discount Fee: | Servicing Fee*: |
|---|---|---|
| Less than or Equal to $350,000 | 1.75% | $2.50 |
| Greater than $350,000 And less than $500,000 | 1.675% | $2.50 |
| Greater than $500,000 And Less than $1.75 Million | 1.50% | $2.50 |
| Greater than $1.75 Million And Less than $3.5 Million | 1.45% | $2.50 |
| Greater than or Equal to $3.5 Million | 1.39% | $2.25 |

DC:2335073v1

- 24 -

\* Charged on a per claim basis (if necessary)

---

**Commercial Bank Account**: All accounts receivable payments will be directed to one of two lockbox bank accounts to be maintained at a New York based commercial bank to be determined at HCI's discretion. All non-government cash will be directed to a control lockbox bank account maintained in HCI's name. In compliance with the governmental anti-assignment provisions, all Medicare/Medicaid cash will be directed to a lockbox bank account maintained in the Provider's name, which will be swept to the control lockbox account. Self-pay receivables, which are not being funded by HCI, (receivables paid directly by residents) will not be lockboxed.

**Basis of Purchase**: In the Exit Funding Facility, HCI proposes to purchase accounts from the Providers, arising from the delivery of patient services on and after the Effective Date of the Plan, on a nonrecourse basis where HCI assumes Credit Risk for the Purchased Accounts. "Credit Risk" means the failure of a Payor of the Provider to pay a Purchased Account that is an Eligible Account solely because of the bankruptcy, insolvency, appointment of a receiver, trustee, assignee for the benefit of creditors or other financial inability to pay of the Payor, post-purchase of the Eligible Account by HCI. Without limitation of the foregoing, HCI shall not be responsible for and may, in HCI's discretion, charge-back to the Providers, by debiting the Reserve account or otherwise, for any Purchased Account which is a) not paid due to the assertion of any claim, offset, or dispute by the Payor, including, without limitation, disputes as to price, quality, quantity, terms of sale or delivery of healthcare services by the Provider to the Payor or the exercise by the Payor of any other right of counterclaim, setoff or recoupment or (b) if any representation or warranty made by the Provider to HCI in respect of the Purchased Account has been breached, intentionally or otherwise. All accounts purchased by HCI that are not collected within 180 days of their date of billing (or, as to accounts in the initial Batch, only, which do not collect within 180 days of the date of purchase), other than accounts not collected due to an intervening post-purchase event of bankruptcy, insolvency or other Credit Risk of the Payors(s) assumed by HCI, will be presumed to be disputed and may be charged-back as disputed by HCI to the Provider, absent evidence, reasonably satisfactory to HCI, furnished by the Provider to HCI at such time, which establishes that, at such date, the subject account (i) is not, in fact, disputed, the subject of a right of counterclaim, offset, set-off, or recoupment and (ii) does not arise from any fraud or misconduct of the Provider. Should the Provider rebut the presumption as to any account(s), the subject account(s) will not be charged back and HCI's ownership and credit risk shall continue.

**Collateral**: As collateral security for the obligations and indebtedness of the Provider to HCI under the Purchase Agreement, Provider will pledge to HCI a first priority security interest in its non-purchased accounts receivable and in all other assets of the Provider, other than those assets on which the FHA Mortgagee (HUD) shall take a first lien, as well as a junior lien on those assets on which the FHA Mortgagee and HUD are taking a first lien (collectively, the "Collateral") pursuant to a mutually acceptable Intercreditor Agreement between HUD, the mortgagee of the landlord of each Provider (each an FHA Mortgagee), HCI and the Provider, HUD and the mortgagee. Additionally, HUD, the FHA Mortgagee for each Provider, and HCI shall also enter into a License and Cooperation Agreement, acceptable to HCI, granting each

other access to property in which the other party has a senior lien. The Lead Debtor shall guarantee the obligations and indebtedness to HCI of each of the Providers under the Purchase Agreement, which obligations and indebtedness shall be cross-collateralized and cross-defaulted, and each Provider shall be liable, individually and collectively, jointly and severally, for the obligations of all other Providers, as aforesaid.

**Servicing**: HCI or its designee shall act as the Master Servicer of the Accounts sold by the Provider to HCI, as Purchaser. Provider shall, subject to Master Servicer's direction and control in all respects, act as Primary Servicer of the Purchased Accounts it has sold to HCI, unless and until replaced by HCI (if ever). Provider shall, with respect to the Purchased Accounts for which it acts as Primary Servicer, maintain all billing records, prepare and deliver bills to Payors, process delinquencies, provide customer service on billing, in all such tasks using commercially reasonable efforts, and in no event less than those employed by Provider with respect to Non-Purchased Accounts, in compliance with applicable law and the regulations thereunder. Provider may not settle, compromise or reclassify Purchased Accounts without HCI's prior written consent.

**Data and Software Interface**: Provider shall have in place, prior to the initial funding by HCI under the Exit Funding Facility, a data and software interface with respect to Provider's claims data with HCI, to allow HCI to monitor the claims data, as HCI may require. HCI will provide its assistance and information technology expertise in creating such interface.

**Bankruptcy Court Approval/"True Sale" Order**: The Bankruptcy Court must make a legal finding, as part of the Order approving the Exit Funding Facility Motion, which Order must be final beyond appeal and acceptable in form and substance to HCI, that the sales of eligible accounts to HCI by the Provider under the Purchase Agreement are "true sales" of the Purchased Accounts, not subject to re-characterization as a loan or financing device, is among the closing conditions of the contemplated transaction.

Such order shall further provide that Purchased Accounts in which HCI takes an ownership interest are being sold to HCI "free and clear" of all existing liens, claims, interests and encumbrances, and, together with Non-Purchased Accounts (and other assets) pledged to HCI by the Provider, as collateral for their Obligations and Indebtedness to HCI under the Purchase Agreements, are not subject to set-off or recoupment of any kind, other than as may be agreed upon by HCI in the funding documents.

This Order must find that HCI holds a first-priority security interest in the Purchased Accounts, i.e., those accounts purchased from and after the Effective Date of the Plan and in the related Conveyed Property, as buyer thereof, and that HCI also holds a first-priority security interest in Non-Purchased accounts and in other Collateral pledged to HCI by the Providers and by the Lead Debtor, itself as reorganized debtor, as guarantor, subject only to such senior liens and encumbrances of the FHA Mortgagees and HUD as per the terms of a mutually acceptable Intercreditor Agreement. The Order must also find that nothing in the Exit Funding Facility impairs the security interests, liens and other rights of HCI under the Bankruptcy Court Order entered effective November 20, 2009, which approved the debtor-in-possession funding facility.

**Origination Fee**: A one time fee equal to 2.5% of the Funding Facility Amount, of which 2.0% will be payable at the closing of the transaction and the remainder (.50%, or $22,500) will be paid ratably and deducted from the respective advances on and over the second through the fifth batches funded, after the initial funding on the Exit Funding Facility has occurred.

**Minimum Monthly Fee**: Only if the Discount Fee is less than $7,500 in any month during the first 9 months of the transaction term (for a one year term) the difference will be deducted from any excess collections received into the lockbox.

**Early Termination Fee**: Provider will be charged a fee for pre-mature termination of the Exit Funding Facility, as follows:

> Within the first 12 months - 3% of the Funding Facility Amount, provided that this clause shall not apply, to create an early termination fee from events arising after December 31, 2010, if the Purchase Agreement is terminated by HCI as of December 31, 2010.

**Required Financial Covenants**: None

**Unused Facility Fee**: None

**Restrictions on the Use of Proceeds**: None

**Targeted Closing Date**: On or before June 30, 2010

**Subordinations**: All pre-petition and post-petition, as well as all post-emergence from Chapter 11, loans, accounts payable or management fees due to corporate insiders by the Providers (but not payment of normal post-petition staff salaries, at commercially reasonable levels per court approved budgets, not to exceed the levels in court approved budgets as of April 1, 2010) will be unconditionally subordinated to HCI with respect to security interest and to right of repayment. Inter-company management fees paid to Affinity Health Care Management, Inc., at commercially reasonable levels, not to exceed pre-petition levels, which are paid in the normal course of business post-petition will also be permitted, on condition that no default has occurred.

HCI to receive, as a condition of closing, subordinations from other lien creditors or judicial relief under the Bankruptcy Code, such that, to the extent not extinguished by the sale of assets free and clear, by order of the Bankruptcy Court, HCI will hold (1) a first priority security interest, as buyer, in all Purchased Accounts and related conveyed books, records and intangibles, and (2) a first priority security interest, as lender in non-purchased Accounts and in substantially all other assets of the Providers, subject, in the case of certain assets, to a senior lien of HUD and the FHA Mortgagees as set forth above, as collateral for the obligations of Providers' and the Lead Debtor to HCI under the Purchase Agreement (the "Collateral"), in each case subject to Recoupments and Set-offs, to the extent acceptable to HCI, and HCI shall also

take a junior lien on all assets in which HUD and the FHA Mortgagees hold senior liens.

Without limitation of the foregoing, all persons, if any, holding liens or security interests in assets of the Providers on the effective date of the Plan, other than HCI itself, shall be required, as a condition of Closing on the Exit Funding Facility, to enter into agreements acceptable to HCI in which they, among other things: (i) acknowledge and stipulate to the ownership interest of HCI in Purchased Receivables and related conveyed property received by HCI under the Purchase Agreements and (ii) agree, irrespective of any default which they may declare as to any Provider, to fully recognize and grant HCI access to all records and property held by HCI under, and to otherwise cooperate with HCI in its collection of, the Purchased and the Non-Purchased Accounts, as HCI may require.

**Working Capital Requirements/Financial Forecasts**: As a condition of HCI's initial funding under the Purchase Agreement, HCI must be satisfied, in its sole discretion, that the Providers will have sufficient working capital and cash flow to be able to satisfy Providers' obligations under the Plan, and sufficient working capital, after giving effect to Providers' sale of receivables to HCI and Providers' application of the sales proceeds, to satisfy Plan obligations and to meet other business needs.

**Recoupment and Set-off Claims; Other Matters**: HCI to receive contractual caps or bars, as HCI may require, with regard to limitations on recoupment and set-off claims, provider tax escrows, from Medicaid/the Connecticut Department of Social Services, the Internal Revenue Service and the Connecticut Department of Revenue, as provided for and consistent with the terms of the Bankruptcy Court's Order entered November 20, 2009, as amended in minor respects, *nunc pro tunc* to November 20, 2009, on December 30, 2009, and HCI shall also receive an agreement with Medicare, acceptable to HCI, as to the effect of 42 C.F.R. 442.90.

**Validity Guaranty**: Benjamin Fischman and Samuel Strasser will each provide a Validity Guaranty with respect to the validity of the accounts receivable purchased/funded by HCI under the Purchase Agreement, as will Affinity Health Care Management, Inc., as reorganized debtor. Each Validity Guaranty of Messrs. Fischman and Strasser will be secured by a pledge to HCI of first-priority security interests in all LLC interests and in all corporate stock interests in the Providers and the Lead Debtor owned by each respective Validity Guarantor, and by a frozen junior lien on the LLC and stock interests owned by Messrs. Fischman and Strasser in the various landlords of the Providers, behind the first lien thereon that Housing and Healthcare Finance, LLC (HHF) is receiving as part of the HUD settlement. HCI will also receive a first priority security interest in all assets of Affinity Health Care Management, Inc., as reorganized debtor. HCI agrees that HHF can take a frozen junior lien on the LLC and stock interests owned by Messrs. Fischman and Strasser in the Alexandria, Blair and Douglas Provider entities (but not in the Ellis Provider entity or in Affinity Health Care Management, Inc.). Each Validity Guarantor will also reaffirm that its entry into the Exit Funding Facility does not impair its prior guaranty in favor of HCI. The lien of HCI in Messrs. Fischman's and Strasser's LLC interests of the Providers and in Messrs. Fischman's and Strasser's stock interests of the Providers and in Affinity Health Care Management, Inc., and in Messrs. Fischman's and Strasser's equity interests in the landlords of Alexandria, Blair and Douglas, so pledged by Messrs. Fischman and Strasser, will be freely executable by HCI, as more fully set forth in the Ratification, Assumption and Assignment Agreement, and Messrs. Fischman and Strasser shall do all things required to

establish (i) that they have sole ownership of such equity interests under New York law and (ii) that such equity interests may be freely executed upon by HHF and by HCI, as the case may be, subject to the Intercreditor Agreement between HCI and HHF.

Without limitation of the foregoing, *other than HHF*, all persons holding liens or security interests in any property or assets pledged to them by any Validity Guarantor, personally, at the time of Closing on the Exit Funding Facility (collectively, the "Junior Guarantor Collateral"), shall be required, as a condition of Closing on the Exit Funding Facility, to execute such further documents as HCI may require in which they, among other things: (i) agree to subordinate, to the security interests and liens in any collateral received by HCI from the respective Validity Guarantor, in support of that guarantor's Validity Guaranty (collectively, the "HCI Senior Guarantor Collateral"), all liens or security interests they hold in the Junior Guarantor Collateral, and (ii) agree, during the time that any account purchased by HCI under the Exit Funding Facility remains outstanding, and until the Purchase Agreement and all indebtedness and obligations owed by the Providers to HCI thereunder have been paid and satisfied, in full, not to collect, take possession of, foreclose, or exercise any other rights or remedies they may hold, judicially or otherwise, in the Junior Guarantor Collateral which they have subordinated to HCI, or attempt to do any of the foregoing. Messrs. Fischman and Strasser shall also affirm that entry into the Exit Funding Facility does not release or impair their existing guarantees with respect to the debtor-in-possession funding facility approved by Bankruptcy Court Order effective November 20, 2009.

**Conditions of Approval of the Exit Funding Facility**: All of the following conditions shall be acceptable to HCI, in its sole discretion:
- Receipt and review of the Plan, in form and substance satisfactory to HCI;
- Entry of Orders by the Bankruptcy Court (i) confirming the Plan and (ii) granting the Exit Funding Facility Motion with respect to HCI's provision of funding under the Exit Funding Facility, including a true-sale finding, in form and substance satisfactory to HCI;
- Entry by the Providers and the Debtors, and the guarantors of each of them, with HCI, into the Ratification, Assumption and Amendment Agreement, in form and substance acceptable to HCI;
- Evidence, in form and substance satisfactory to HCI, that all conditions precedent to the effectiveness of the Plan and to the emergence of the Providers and the Lead Debtor from Chapter 11 (other than the condition of the exit funding to be provided by HCI on the terms hereof), and all conditions of the Ratification, Assumption and Amendment Agreement, have been satisfied;
- Entry by HUD and the landlords of the Providers into agreements for the restructure of the mortgages of the Provider's landlords, and related rent concessions from such landlords to the Providers, acceptable to HCI;
- HCI's receipt and acceptance of monthly projections for the operations of the Providers for the first thirty-six (36) months following their emergence of Chapter 11, in HCI's sole discretion;
- HCI's acceptance of the chief financial officer selected for the Providers by the Connecticut Department of Social Services, pursuant to the Plan;
- No material adverse changes in the financial performance or condition of the Providers, as debtors-in-possession, or in capital markets, since the date of the initial provision of

debtor-in-possession funding by Health Capital Receivables Funding Special Purpose Corporation I, an affiliate of HCI, (whose position was later assigned to HCI), under the Bankruptcy Court Order entered November 20, 2009, as thereafter amended, from time to time;

- Execution of Intercreditor and Subordination Agreements, and caps on recoupments and set-offs, as aforesaid;
- Satisfaction of all terms and conditions to initial funding under the Purchase Agreement and under this letter, including, without limitation, receipt of such legal opinions, landlord waiver and estoppel letters, subordination and non-disturbance agreements from mortgagees, landlords, HUD and other persons, as HCI may require, in its sole discretion; and
- Agreement of all professionals to allow for the payout of outstanding professional fees through ratable monthly payments over a period of 60 months.

**Cooperation**: HCI shall have access to all relevant facilities, personnel and accountants, and copies of all documents which HCI may reasonably request, including business plans, financial statements (actual and pro forma), books, records, and other documents of the Debtors and the Reorganized Debtors.

[add signatures of each Reorganized Debtor and HCI].

ACTIVE/72743.1/EA/2137138v1