# AFFINITY
# 08-22175

# EXHIBIT A PART ONE
# TO ORDER

# FOURTH AMENDED JOINT PLAN OF
# REORGANIZATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | | |
|---|---|---|
| In re: | x | Chapter 11 |
| | : | |
| AFFINITY HEALTH CARE | : | Case No. 08-22175 (ASD) |
| MANAGEMENT, INC., et al,[1] | : | |
| | : | (Jointly Administered) |
| Debtors | : | |
| | x | May 25, 2010 |

## FOURTH AMENDED JOINT PLAN OF REORGANIZATION FOR AFFINITY HEALTH CARE MANAGEMENT, INC., HEALTH CARE INVESTORS, INC., HEALTH CARE ALLIANCE, INC., HEALTH CARE ASSURANCE, L.L.C. AND HEALTH CARE RELIANCE, L.L.C.

Affinity Health Care Management, Inc. ("Affinity"), Health Care Investors, Inc.

d/b/a Alexandria Manor ("Alexandria"), Health Care Alliance, Inc. d/b/a Blair Manor

("Blair"), Health Care Assurance, L.L.C. d/b/a Douglas Manor ("Douglas"), and Health

Care Reliance, L.L.C. d/b/a Ellis Manor ("Ellis") (collectively, the "Debtors"), debtors

and debtors-in-possession in the above captioned Chapter 11 case, proposes the

following Fourth Amended Plan of Reorganization (the "Plan"), for the Debtors

pursuant to Section 1121(a) of Title 11 of the United States Code.

---

[1]   Affinity Health Care Management, Inc., Case No. 08-22175, Health Care Investors, Inc. d/b/a Alexandria Manor, Case No. 08-22177, Health Care Alliance, Inc. d/b/a Blair Manor, Case No. 08-22178, Health Care Assurance, L.L.C. d/b/a Douglas Manor, Case No. 08-22179, and Health Care Reliance, L.L.C. d/b/a Ellis Manor, Case No. 08-22180.

## INTRODUCTION

All holders of claims and interests should read the Plan and the Second Amended Disclosure Statement ("Disclosure Statement") in their entirety before voting to accept or reject the Plan. The Debtors reserve the right to amend, modify, revoke or withdraw the plan prior to its substantial consummation pursuant to Bankruptcy Code §1127 and Bankruptcy Rule 3018.

All statements in this Plan and the accompanying Disclosure Statement concerning the history of Debtors' business, Debtors past or present financial condition, transactions to which Debtors were or are parties, or the effect of confirmation of the Plan on secured creditors, administrative claimants, unsecured creditors or equity interest holders are attributable exclusively to the Proponents and not to any other party. Holders of claims and equity interests, and parties to executory contracts and unexpired leases are encouraged to read the Disclosure Statement. No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith, and approved for solicitation purposes by the Bankruptcy Court, have been authorized for use in soliciting acceptances or rejections of this Plan.

## ARTICLE I
## DEFINITIONS

(a)   **DEFINED TERMS.** As used herein, the following terms have the
respective meanings specified below, except as expressly provided otherwise
or unless the context otherwise requires (such meaning to be equally applicable
to the singular and plural forms of the terms defined, unless the context
otherwise requires).   Terms in this Plan, but not defined below, shall have the
meaning ascribed to them in the Bankruptcy Code.

**1.01. Administrative Claim** means a Claim for (a) any cost or expense of
administration (including Professional Claims) of the Chapter 11 case asserted or
arising under Sections 503, 507(a)(1), or 507(b) of the Code, including (i) the actual
and necessary costs and expenses of preserving property of the estate during the
chapter 11 case, (ii) any payment to be made under the Plan to cure a default on an
assumed executory contract or unexpired lease (iii) any contracts or agreements
entered into by the Debtors during the chapter 11 case (iv) Allowed Professional
Claims (v) fees or charges assessed against the Debtors' estate under Section 1930
of Title 28 of the United States Code and (vi) Administrative Claims that are Allowed
as such by Final Order.

**1.02. Administrative Claim Bar Date** means February 8, 2010, the date set
pursuant to the Order of the Court which requires that anyone other than Court-

3

approved professionals retained by the Debtors or the Creditors Committee, asserting an Administrative Claim file such Claim no later than February 8, 2010, or be forever barred from asserting such a Claim against the Debtors.

**1.03. Affiliate** with respect to any Person, any other Person that directly or indirectly controls or is controlled by or under indirect common control with such Person. For purposes of this definition, "control", when used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise; and the terms of "affiliated", "controlling" and "controlled" have meanings correlative to the foregoing.

**1.04. Affinity** means Affinity Health Care Management, Inc.

**1.05. Alexandria** means Health Care Investors, Inc. d/b/a Alexandria Manor.

**1.06. Allowed Administrative Expense** means any administrative expense, or portion thereof, with respect to which (i) a timely and proper request for payment has been made to the extent required by this Plan, and (ii) either (a) such administrative expense is subject to allowance by the Bankruptcy Court pursuant to Bankruptcy Code §§ 330, 331, 503(b)(2)-(5) or § 503(b)(9), but only to the extent such administrative expense is actually allowed by the Bankruptcy Court or any professional fee allowance procedures authorized by the Bankruptcy Court and then in effect, or (b) such administrative expense is not subject to allowance by the Bankruptcy Court

4

pursuant to Bankruptcy Code §§ 330, 331, 503(b)(2)-(5) or § 503(b)(9), but only to the extent that the amount, validity and priority, or enforceability of such administrative expense is not the subject of a bona fide dispute, including without limitation, an objection that has been resolved by a Final Order.

**1.07. Allowed Claim** means (a) any claim, proof of which was filed with this Court on or before the Bar Date, or which has been or is hereafter scheduled by the Debtors as a liquidated amount and not disputed or contingent and which, in either case, is a claim to which no objection to the allowance thereof has been filed within the applicable period of limitations (if any) for objection to claims fixed by the Court, or to which any objection has been withdrawn or determined by a final order and all or portion of such claim has been found to be allowed pursuant to such final order, or (b) a claim that is allowed (i) in any contract, instrument or other agreement entered into in connection with the Plan, (ii) in a Final Order, or (iii) pursuant to the terms of the Plan.

**1.08. Allowed Interest** means an Interest (a) in respect of which a proof of claim has been filed with the Court within the applicable period of limitation fixed by Rule 3001 or (b) scheduled in the list of Equity Security Holders prepared and filed with the Court pursuant to Rule 1007(b), in either case as to which no objection to the allowance thereof has been interposed within any applicable period of limitation fixed by Rule 3001 or an order of the Court, or to which any objection has been determined

5

by an order, or judgment, which is no longer subject to appeal or certiorari proceeding and as to which no appeal of certiorari proceeding is pending.

**1.09. Amended and Restated Certificate Bylaws** means with respect to each Reorganized Debtors, the Amended and Restated Bylaws for such Reorganized Debtors that is a corporation, which shall be substantially in the forms of the examples set forth in the Plan Documentary Supplement.

**1.10. Amended and Restated Certificate of Incorporation** means with respect to each Reorganized Debtors, the Amended and Restated Certificate or Articles of Incorporation (or documents or similar effect with respect to any Debtors that is not a corporation) for such Reorganized Debtors, which shall be substantially in the forms of the examples set forth in the Plan Documentary Supplement.

**1.11. Available Cash** means the Debtors' aggregate cash on hand as of the Effective Date, plus the initial net funding proceeds of the Exit Funding Facility, if any (excluding any proceeds earmarked to pay claims).

**1.12. Avoidance Actions** means any and all Causes of Action that a trustee, debtor-in-possession, the Estate, or other legal representative or appropriate party in interest may assert under any section of Chapter 5 or section 724(a) of the Bankruptcy Code or any similar state or federal law.

6

**1.13. Avoidance Action Recoveries** means any amounts recovered by the Estate on account of Avoidance Actions after deduction of any professional fees and expenses and other costs incurred in obtaining such recoveries, including taxes, if any.

**1.14. Ballot** means the ballot accompanying the Disclosure Statement.

**1.15. Ballot Voting Date** means the date set as the last day by which Holders of Claims entitled to vote on the Plan shall have delivered their Ballot to the Debtors Voting Agent.

**1.16. Bankruptcy Code** or **Code** means Title 11 of the Untied States Code, as in effect on the petition date, together with all amendments and modifications thereto that are subsequently made applicable to the Case.

**1.17. Bankruptcy Court** or **Court** means the Bankruptcy Court for the District of Connecticut, or, if such court ceases to exercise jurisdiction over these proceedings, the Court or adjunct hereof that exercises jurisdiction over the Chapter 11 case.

**1.18. Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure effective August 1, 1996 in accordance with the provisions of 28 U.S.C. § 2075.

**1.19. Bar Date** means March 9, 2009 and is the date by which all Holders of Claims against the Debtors, other than Governmental Agencies, were required to file a Proof of Claim or be forever barred from asserting such Claim, directly or indirectly, against the Debtors or the Reorganized Debtors.

**1.20. Blair** means Health Care Alliance, Inc. d/b/a Blair Manor.

7

**1.21. Business Day** means any day except a Saturday, Sunday or any other day on which commercial banks are authorized by law in the State of Connecticut to close.

**1.22. Cash** means money, currency, coins, negotiable checks, wire transfers and other lawful currency of the United States of America and its equivalents.

**1.23. Chapter 11 Cases** means the Chapter 11 cases of the Debtors, Case No. 08-22175 and Case Nos. 08-22177 through 08-22180, assigned to Bankruptcy Judge Albert L. Dabrowski file in the United States Bankruptcy Court, District of Connecticut, Hartford Division.

**1.24. Causes of Action** means any and all actions (other than the Avoidance Actions, as defined herein), Claims (as defined herein), rights, defenses, interpleader claims, chooses in action, controversies, rights to legal or equitable remedies rights to payment and Claims whatsoever, whether known, unknown, reduced to judgment or not, liquidated, unliquidated, fixed, contingent, matured, unmatured and whether asserted or assertable indirectly or derivatively, at law, in equity or otherwise.

**1.25. Claim** means (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) right to an equitable remedy for breach of performance if such right gives rise to a right to payment, whether or not such right

8

to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or (c) any right, request for payment, administrative expense claim or Claim arising under a contract or agreement that is rejected or deemed rejected pursuant to the Code.

**1.26. Claim Objection Deadline** means the date that is forty-five (45) days after the Effective Date, and shall be the last day for objecting to Claims asserted against the Debtors' Estate

**1.27. Code** means the United States Bankruptcy Code.

**1.28. Class** means a group of claims or interests which are substantially similar to each other as classified herein.

**1.29. Confirmation** means the entry by the Bankruptcy Court of the Confirmation Order.

**1.30. Confirmation Date** means the date on which the Clerk of the Court enters the Confirmation Order on the docket.

**1.31. Confirmation Hearing** means the hearing on confirmation of the Plan.

**1.32. Confirmation Order** means the order entered by the Court confirming the Plan pursuant to Section 1129 of the Code.

**1.33. Creditor** means a creditor as defined in 11 U.S.C. Section 101(10).

**1.34. Creditors Committee** means the Official Committee of Unsecured Creditors appointed pursuant to 11 U.S.C. §1102(a)(1) on November 4, 2008.

9

**1.35. Creditors Committee Counsel** means Neubert, Pepe & Monteith, P.C. counsel to the Creditor's Committee.

**1.36. Debtors** means Affinity Health Care Management, Inc., Health Care Investors, Inc. d/b/a Alexandria Manor; Health Care Alliance, Inc. d/b/a Blair Manor; Health Care Assurance, L.L.C. d/b/a Douglas Manor; and Health Care Reliance, LLC d/b/a Ellis Manor.

**1.37. Debtors' Counsel** shall mean Pullman & Comley, LLC, bankruptcy counsel for the Debtor.

**1.38. Debtors-in-Possession** means the Debtors when each is acting in the capacity of a representative of the Estates of the Chapter 11 Cases.

**1.39. Debtors' Inter-Company Claims** means all claims and administrative expenses of any of the Debtors against any of the other Debtors, whether reflected on the Debtors' Books and Records or otherwise.

**1.40. DRS** means the State of Connecticut Department of Revenue Services.

**1.41. DSS** means the State of Connecticut Department of Social Services.

**1.42. Disallowed** means with respect to any Claim or portion thereof, any Claim against the Debtors which has not be Allowed pursuant to the Plan and which (i) has been disallowed, in whole or in part, by a Final Order of the Court, (ii) has been withdrawn by agreement of the Debtors and the Holder of the Claim, (iii) has been withdrawn by the Holder of the Claim, (iv) if listed in the Schedules as zero, as $1.00

10

or as disputed, contingent or unliquidated and in respect of which a timely Proof of Claim has not been filed, or (v) has been reclassified, expunged, subordinated or estimated, to the extent there is a reduction in the filed amount of the Proof of Claim.

**1.43. Disallowed Claim** means a Claim, or any portion thereof, that is Disallowed.

**1.44. Disclosure Statement** means the Debtors' Second Amended Joint Disclosure Statement with respect to the Plan, including all exhibits, appendices and schedules, if any, attached thereto, prepared and distributed in accordance with Sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018, as same may be altered, amended, supplemented or modified from time to time.

**1.45. Disputed Claim** means any Claim (a) which is listed on the Debtors' Schedule as disputed, contingent or unliquidated; or (b) with respect to which an objection has been filed and not subsequently withdrawn by the Debtors, and which has not been finally determined, in whole or in part, by a final order; or (c) pursuant to Section 502(d) of the Bankruptcy Code, held by a creditor who may be a defendant in an adversary proceeding commenced by or on behalf of the Debtors under Chapter 5 of the Bankruptcy Code.

**1.46. Disputed Claims Reserve** means any reserve referred to in Section 5.01 of the Plan.

**1.47. Distribution Date** means the date or dates on which the Holder of an Allowed Claim or Interest shall receive a distribution pursuant to this Plan.

**1.48. Douglas** means Health Care Assurance, L.L.C. d/b/a Douglas Manor.

**1.49. Effective Date**.   The Effective Date may be scheduled upon written consent of the Debtors, provided all conditions to consummation of the Plan have been satisfied, or if capable of being expressly waived, such conditions shall have been satisfied or expressly waived.  The Effective Date shall be at least 14 days from the date of entry of the Confirmation Order, unless otherwise agreed by the Debtors.

**1.50. Ellis** means Health Care Reliance, LLC d/b/a Ellis Manor.

**1.51. Estate** means each of the estates created upon commencement of the Case pursuant to Section 541 of the Code.

**1.52. Equity Interest** means any equity interest in any of the Debtors whether in the form of a common or preferred stock, stock options, warrants, partnership interests, membership interests or other security interests.

**1.53. Exit Funding Facility** has the meaning set forth in Section 7.03 of the Plan.

**1.54. Final Decree** means the final decree entered by the Bankruptcy Court, pursuant to Section 350 (a) of the Code and Bankruptcy Rule 3022.

**1.55. Final Order** means an order, ruling, judgment or other decree issued by the Court that has not been reversed, vacated, stayed, modified or amended and as to

which (i) the time to appeal or petition for review or certiorari has expired and as to which no appeal, petition for review or certiorari is pending, (ii) any appeal, petition for review or certiorari has been finally decided or dismissed and no further appeal or petition for review or certiorari can be taken or granted, or (iii) an appeal or petition for review or certiorari, application for rehearing, reargument or retrial is pending, but no stay has been entered.

**1.56. General Unsecured Claims** means all the claims other than the Administrative Expense Claims, Secured Claims, Priority Tax Claims or Classified Priority Claims, if any.

**1.57. Governmental Unit Bar Date** means April 8, 2009 is the deadline by which all Governmental Agencies who wish to assert a claim against the Debtors were required to file a Proof of Claim or be forever barred from asserting such claim, directly or indirectly, against the Debtors.

**1.58. GMAC** means GMAC Automotive Financing.

**1.59. Great American** means Great American Leasing.

**1.60. Holder** means the holder of a Claim or Interest.

**1.61. HCI** means Health Capital Receivables Funding Administrative Corporation, a New York Corporation, assignee of Health Capital Receivables Funding Special Purpose Corporation I, a New York Corporation.

13

**1.62. HHF** means Housing & Healthcare Finance, LLC, a Delaware Limited Liability Company.

**1.63. HUD** means the United States Department of Housing and Urban Development.

**1.64. HUD Settlement** means the settlement among HUD, the Debtors, and the Real Estate Entities which has been incorporated into a settlement agreement, a copy of which is attached hereto as Exhibit 2 and incorporated herein by reference.

**1.65. Impaired** means impaired within the meaning of Code section 1124.

**1.66. Impaired Interest** means an Interest which is Impaired.

**1.67. Initial Distribution Date** means the date that is the first business day after the Effective Date.

**1.68. Insider** means an insider as defined by Code section 101 (30).

**1.69. IRS** means the United States Department of Internal Revenue Services.

**1.70. Interest** means any rights arising out of the ownership of Common Stock or membership interests of one or more of the Debtors.

**1.71. Liens** means with respect to any asset or property, whether the same is consensual or non-consensual or arises by contract or operation of law, legal process or otherwise: (a) mortgages, liens, pledges, attachments, conditional sale or other title retention agreement or other security interest or encumbrance.

14

**1.72. Medicaid** means the Connecticut Medicaid Program, Title XIX of the Social Security Act Amendments of 1965, Public Law No. 89-97.

**1.73. Medicare** means the United States Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 to 1395ggg.

**1.74. Metro** means Metro Exchange LLC.

**1.75. Metro/IRS Settlement Agreement** means the Settlement Agreement among Metro, the IRS and the Debtors, approved by Order of the Bankruptcy Court on November 20, 2009, a copy of which is attached hereto as Exhibit 1 and incorporated herein by reference.

**1.76. Objection** means any objection, application, motion, complaint or any other legal proceeding, including the terms of this Plan, seeking, in whole or in part, to disallow, determine, liquidate, classify, estimate or expunge any Claim.

**1.77. Operating Entities** means Alexandria, Blair, Douglas and Ellis.

**1.78. Person** means and includes a natural person, individual, partnership, corporation, limited liability company, joint venture, trust, unincorporated organization or organization, irrespective of whether they are legal entities, and governmental bodies(or any agency, instrumentality or political subdivision thereof).

**1.79. Petition Date** means October 14, 2008.

**1.80. Plan** means this Fourth Amended Chapter 11 Plan, as same may be further amended, supplemented and modified from time to time, and all exhibits, schedules and attachments.

**1.81. Post-Petition Funding Facility** means the Post-Petition Funding Facility (variously, the "DIP Funding Facility") provided by Health Capital Receivables Administrative Corporation, a New York corporation ("HCI") assignee of Health Capital Receivables Funding Special Purpose Corporation I, a New York corporation ("HCRFSPC") pursuant to the Purchase Agreement and related funding documents dated November 18, 2009 between HCRFSPC and the Debtors (as thereafter amended from time to time to, among other things, extend the term of the debtor-in possession funding facility from its original 90 days and to reflect the assignment by HCRFSPC of its rights as Purchaser to HCI), as approved by the Bankruptcy Court on November 20, 2009 (as amended, in minor respects, by further Order dated December 30, 2009) pursuant to which, on November 25, 2009, the Providers sold substantially all of their accounts and related books, records and other Conveyed Property to HCRFSPC in a "true sale" with HCRFSPC and later HCI, its assignee, taking a first-priority security interest in such assets as buyer thereof. HCRFSPC (and its assignee, HCI) were also granted a first priority security interest, as lender, in Non-Purchased Accounts (all accounts not sold to the factor, such as self-pay accounts), in credit balances owed by the factor to the Providers in respect of accounts sold to the factor,

and in substantially all other assets of the Debtors, as security for the obligation and indebtedness of Providers to HCRFSPC (and later HCI) under the Post-Petition Funding Facility arising from unsatisfied charge-backs, discount fees and other costs and expenses due and owing by the Providers.

**1.82. Priority Non-Tax Claim** means any Claim other than Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment. as specified in Sections 507(a)(2), (3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

**1.83. Priority Tax Claim** means any and all Claims accorded priority in payment pursuant to Code section 507(a)(8).

**1.84. Professional Claim** means a claim for compensation or reimbursement of expenses pursuant to code sections 327, 328, 330, 331 or 503(b) relating to services rendered on or after the Petition Date and prior to the Confirmation Date.

**1.85. Professional Fees** means any and all fees and expenses awarded by the Bankruptcy Court to any Professionals.

**1.86. Professional** means any attorney, law firm, accountant, accounting firm or other person employed in this Case by the Debtors or Committee pursuant to Code sections 327 or 1103.

**1.87. Proof of Claim** means any proof of claim filed with the Court with respect to the Debtors or the Estate.

**1.88. Property** means all assets of the Debtors' Estate of any nature whatsoever, real or personal, tangible or intangible, including contract rights, accounts, Avoidance Actions, cash on hand now owned by the Debtors or acquired by the Debtors prior to the Effective Date, and includes property of the Estate as defined in Section 541 of the Code.

**1.89. Property A** means Alexandria Manor Associates, LLC, the entity that owns the property at which Alexandria operates.

**1.90. Property B** means Blair Manor, LLC, the entity that owns the property at which Blair operates.

**1.91. Property D** means Assurance Health Care Associates, LLC, the entity that owns the property at which Douglas operates.

**1.92. Property E** means Reliance Health Care Associates, LLC, the entity that owns the property at which Ellis operates.

**1.93. Pro Rata Share** means with respect to any distribution to the Holder of an Allowed Claim, a fraction, the numerator of which will be the amount of the Holder's Allowed Claim and the denominator of which will be the sum of all Allowed and Disputed Claims in the same Class as the Holder, all determined as of the applicable Distribution Date.

**1.94. Proponents** means the Debtors.

**1.95.  Providers** shall mean the operating entities, Alexandria, Blair, Douglas and Ellis.

**1.96.  Release Parties** means all members and shareholders of the Debtors and the Real Estate Entities shown on Exhibit 4 attached hereto.

**1.97.  Real Estate Entities** means Alexandria Manor Associates, LLC, Blair Manor, LLC, Assurance Health Care Associates, LLC, and Reliance Health Care Associates, LLC and which are the entities that own the properties at which Alexandria, Blair, Douglas and Ellis, respectively, operate and have common ownership with the Debtors.

**1.98.  Reorganized Debtors** means the Debtors as reorganized pursuant to this Plan.

**1.99.  Rules** mean the Federal Rules of Bankruptcy Procedure.

**1.100. Schedules** means the Schedules, Statements and Lists filed by the Debtors with the Bankruptcy Court, as they have been amended or supplemented from time to time.

**1.101. Secured Claim** means a claim that is secured pursuant to Code section 506(a).

**1.102. Solicitation** means the solicitation by the Debtors that includes the Disclosure Statement, Ballots and related materials.

**1.103. State** means the State of Connecticut and any department, Agency or subdivision of the foregoing or any fiscal, intermediary, agent or authorized representative of the foregoing when acting in such capacity.

**1.104. State Settlement** means the settlement between the State of Connecticut Department of Social Services, the State of Connecticut Department of Revenue Services and the Debtors which has been memorialized in a settlement agreement, a copy of which is attached hereto as Exhibit 3 and incorporated herein by reference.

**1.105. Tax** means any Allowed tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign government or governmental authority or agency, including without limitation income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use ad valorem, estimated, severance, stamp, occupation or withholding tax, together with any interest, penalties, fines or additions attributable to, imposed on, relating to, or collected by any such entity.

**1.106. Unclassified Claims** means Claims excluded from classification under the Plan pursuant to Code section 1123 (a) (i).

**1.107. Unimpaired** means any Claim that is not Impaired with in the meaning of Code section 1124.

**1.108. United States Trustee** means the United States Trustee appointed under Section 581 (a)(3) of the United States Code.

**B.      RULES OF INTERPRETATION.** Any term used in the Plan that is not defined in the Plan, but that is used in the Bankruptcy Code or Rules shall have the meaning assigned to that term (and shall be construed in accordance with the rules of construction) in the Code or Rules. The rules of construction in Code section 102 shall apply to the Plan. In computing any period of time prescribed by or allowed by the Plan, Rule 9006(a) shall govern.

The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan as a whole and not to any particular Article, section, subsection or clause in the Plan, unless the context requires otherwise.

Any reference in the Plan to a document, by-law, certificate or other agreement being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions. Any reference in the Plan to an existing document or exhibit means such document or exhibit as it may have been amended, restated, modified or supplemented as of the Effective Date.

The provisions of the Plan shall control over any descriptions contained in the Disclosure Statement.

21

    **C.**    **METRO/IRS SETTLEMENT AGREEMENT**.  The Metro/IRS Settlement Agreement attached as Exhibit 1 is incorporated into and made a part of the Plan as if set forth herein, provided however all Parties to the Settlement Agreement have agreed that post-confirmation payments provided for therein shall commence on July 31, 2010, as opposed to April 1, 2010.  Pursuant to the terms of the Metro/IRS Settlement, Metro received a total of $1,500,000 in full satisfaction of Metro's Secured Claim, and the IRS received a total of $875,662.46 in full satisfaction of the IRS Secured Claim.  The Metro/IRS Settlement was approved by the Bankruptcy Court by order dated November 20, 2009.

    **D.**    **HUD SETTLEMENT AGREEMENT.**    The Settlement Agreement between HUD, the Debtors and the Real Estate Entities, attached hereto as Exhibit 2 and is incorporated into and made a part of the Plan as if set forth herein.  The Debtors are requesting that the Bankruptcy Court approve the HUD Settlement Agreement through the confirmation of this Plan.

    **E.**    **STATE SETTLEMENT AGREEMENT.**  The State Settlement Agreement attached as Exhibit 3 is incorporated into and made a part of the Plan as if set forth herein.  The Debtors are requesting that the Bankruptcy Court approve the State Settlement Agreement through the confirmation of this Plan.

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

**2.01. General Provisions.** Pursuant to Code section 1122, the Debtors designates the following classes of Claims and Interests. A Claim or Interest is classified in a particular class only to the extent the Claim or Interest qualifies within the description of the Class, and is classified in a different Class to the extent the Claim or Interest qualifies for such different Class. A Claim or Interest will receive a distribution in a Class only to the extent such Claim or Interest is an Allowed Claim or Allowed Interest.

**2.02. Unclassified Claims.** Pursuant to Code section 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified in the Classes of the Plan, and the treatment of such claims is described in Article III of the Plan.

**2.03. Classified Claims.** The Plan classifies the following Claims and Interests:

**2.04.** Class 1 – Priority Non-Tax Claims

**2.05.** Class 2 – Secured Claim of HCI

**2.06.** Class 3 – Secured Claim of DRS

**2.07.** Class 4 –Secured Claim of DSS

**2.08.** Class 5 – Secured Claim of GMAC

**2.09.** Class 6 – Secured Claim of Great American

**2.10.** Class 7 – General Unsecured Claims

**2.11.** Class 8 – Equity Interests

**2.12. Impaired Claims** – The Plan classifies the following Claims as Impaired:

      (a)    Class 2 – Secured Claim of HCI

      (b)    Class 4 – Secured Claim of the State

      (c)    Class 5 – Secured Claim of GMAC

      (d)    Class 6 – Secured Claim of Great American

      (e)    Class 7 – General Unsecured Claims

      (f)    Class 8 – Equity Interests

**2.13. Unimpaired Claims** – The Plan classifies the following Claims as Unimpaired:

      (a)    Class 1 – Priority Non-Tax Claims

      (b)    Class 3 – Secured Claim of the State (DRS)

## ARTICLE III

### CLASSIFICATION AND TREATMENT OF ADMINISTRATIVE
### EXPENSE CLAIMS, TAX CLAIMS AND OF CLAIMS AND INTERESTS

**3.01. Satisfaction of Claims and Interests**. The treatment of and consideration to be received by Holders of Allowed Claims and Allowed Interests pursuant to this Plan when paid shall be in full satisfaction, settlement, release,

extinguishment and discharge of such Allowed Claims against and Allowed Interests in the Debtors and the Property of the Debtors, except as expressly provided in the Plan or the Confirmation Order.

**3.02. Trustee Statutory Fees.** Any unpaid statutory fees due pursuant to 28 U.S.C. § 1930 which are owed by the Debtors to the United States Trustee shall be paid in full, in cash, on or before the Effective Date. Any statutory fees pursuant to 28 U.S.C. § 1930 occurring after the Effective shall be paid when due until the entry of a Final Decree.

**3.03. Administrative Claims.** Administrative Claims are Unimpaired. Unless otherwise provided herein, each Holder of an Allowed Administrative Claims shall receive in full satisfaction, settlement and discharge of such Claim (a) the amount of such unpaid Allowed Claim in Cash on the later of: (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed by Final Order, and (iii) a date agreed to by the Debtors and the Holder; or (b) such other treatment as may be agreed to in writing by the Debtors and the Holder of such Claim, or (c) such other treatment as ordered by the Bankruptcy Court pursuant to a Final Order.

**3.04. Professional Fees.** The Debtors estimate that upon the Effective Date, there will be approximately $780,000[2] of accrued and unpaid professional fees which

---

[2] Approximately $170,000 of this amount represents fees and expenses claimed by Eiseman Levin Lehrhaupt & Kakoyiannis PC and Hofheimer Gartlir & Gross, LLP, which fees are in dispute.

include $322,000 of fees held back from prior fee applications pending the submission and approval of final fee applications.  The Debtors shall pay Allowed Professional Claims as determined by the Bankruptcy Court, and shall pay such allowed amounts as determined by the Court in twelve equal monthly installments of the total amount due each professional.      The first payment shall be paid on the later of (i) September 10, 2010 or (ii) the tenth day after the order approving the fees becomes final, and on the tenth day of each month thereafter.

**3.05. Section 503(b)(9) Claims.**  Holders of 503(b)(9) claims are unimpaired and do not vote on the Plan.  The following holders of 503(b)(9) claims shall receive in full satisfaction, release and discharge of such claim, the amount of such allowed 503(b)(9) claim in cash installments are set forth below, and as agreed to by the Debtors and the Holders of the 503(b)(9) claims.

(i)      **Value Health Care Services LLC**.  Value Health Care Services LLC holds an administrative claim pursuant to § 503(b)(9) of the Bankruptcy Code in the amount of $61,000.00, which claim will be paid in equally quarterly installments, commencing on July 31, 2010 and continuing each quarter thereafter for a period of five years.

(ii)      **Connecticut Support Services, LLC.**      Connecticut Support Services, LLC holds an administrative claim pursuant to § 503(b)(9) of the Bankruptcy Code in the amount of $7,013.05, which claim will be paid in

equal quarterly installments, commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

(iii) **Medline Industries.** Medline Industries holds an administrative claim pursuant to § 503(b)(9) of the Bankruptcy Code in the amount of $25,157.01, which claim will be paid in equal quarterly installments, commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

(iv) **Dusso Food Service.** Dusso Food Service holds an administrative claim pursuant to § 503(b)(9) of the Bankruptcy Code in the amount of $53,340.43, which claim will be paid in equal quarterly installments, commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

**3.06. Other Administrative Claims**.

(i) **Aetna**. Aetna asserts an administrative claim for reconciliation charges due following the termination of an insurance plan in the amount of $124,861.19, which claim will be paid in equal quarterly installments commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

**3.07. Priority Tax Claims**. Priority Tax claims are Unimpaired and do not vote on the Plan. Each Holder of an Allowed Priority Tax Claim shall receive in full

27

satisfaction, release and discharge of such Claim the amount of such Allowed Priority Tax Claim in Cash as follows as agreed to by the Debtors and the Holders of the Allowed Priority Tax Claim.

      (i)    **Unsecured Priority Tax Claim of the IRS.** The IRS holds an Unsecured Priority Claim in the total amount of $335,707.71, which claim will be paid in equal quarterly installments commencing on July 31, 2010 and continuing each quarter thereafter for a period of five (5) years, plus statutory interest at 6% per annum. This amount includes the $100,000 agreed to be paid pursuant to the Metro/IRS Settlement Agreement.

      (ii)    **Unsecured Priority Claim of the State for Nonprovider Taxes.** As of the Petition Date, the State holds an Unsecured Priority Claim for Nonprovider Taxes, in the amount of $401,214.20, consisting of $382,418.15 in principal and $18,796.05 in interest, which claim will be paid in equal quarterly installments commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years, plus statutory interest at 12% per annum.

      (iii)    **Unsecured Priority Tax Claim of the State of Connecticut Department of Labor.** As of the Petition Date, the State of Connecticut Department of Labor held an Unsecured Priority Claim for unemployment compensation employer tax in the amount of $51,170.10, which

Claim will be paid in equal quarterly installments commencing on July 31, 2010, and continuing each quarter until December 31, 2013, plus statutory interest at 12% per annum.

(iv)   **Unsecured Priority Tax Claim of the City of Hartford.** As of the Petition Date, the City of Hartford held an Unsecured Priority Claim for personal property taxes in the amount of $41,590.54, which Claim will be paid in equal quarterly installments commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

(v)   **Unsecured Priority Tax Claim of the Town of Windham.** As of the Petition Date, the Town of Windham held an Unsecured Priority Claim for personal property taxes in the amount of $6,434.21, which claim will be paid in equal quarterly installments commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

(vi)   **Unsecured Priority Tax Claim of the Town of Bloomfield.** As of the Petition Date, the Town of Bloomfield held an Unsecured Priority Claim for personal property taxes in the amount of $5,880, which claim will be paid in equal quarterly installments commencing on July 31, 2010 and continuing each quarter thereafter for a period of five (5) years.

(vii)   **Unsecured Priority Tax Claim of the Town of Enfield.** As of the Petition Date, the Town of Enfield held an Unsecured Priority Claim

29

for personal property taxes in the amount of $4,840, which claim will be paid in equal quarterly installments commencing on July 31, 2010, and continuing each quarter thereafter for a period of five (5) years.

**3.08.  Class 1 – Priority Non-Tax Claims**.

(i)      **Unsecured Priority Claim of New England Health Care Employees Pension Fund.**  As of the Petition Date, the New England Health Care Employees Pension Fund held an unsecured Priority Claim for benefit plan contributions in the amount of $101,455.07, which claim will be paid in equal quarterly installments commencing on July 31, 2010 and continuing each quarter thereafter for a period of five (5) years.

**3.09.  Class 2 – Secured Claim of HCI.**  HCI, assignee of HCRFSPC, holds a secured claim against the Providers under the Post-Petition Funding Facility for unsatisfied indebtedness and other obligations in respect of, among other things, unpaid discount fees, unsatisfied chargebacks and other expenses and costs due and owing to HCI by the Providers under the Post-Petition Funding Facility, which debt is secured by a first lien on Non-Purchased Accounts, credit balances and substantially all other assets of the Providers, together with HCI's claims against Affinity under its Validity Guaranty, as secured by a first lien on all assets of Affinity.  The Post-Petition Funding Facility with HCRFSPC, who later assigned its position to HCI, was approved by the Bankruptcy Court on November 20, 2009 (as amended, in minor respects, by

further Order dated December 30, 2009), wherein the Debtors entered into the Post-Petition Funding Facility which provides for the purchase by the factor in its discretion of commercial and government health care accounts of the Providers and, in turn, calls for the Providers to receive advances, financial accommodations and other post-petition funding from HCI. Under the Post-Petition Funding Facility, HCRFSPC and later its assignee, HCI received, among other things, a first priority security interest in Purchased Accounts and in related Conveyed Property sold by the Providers to the factor, as the buyer thereof, in a true sale.

Additionally, the Providers granted to the factor an administrative super priority claim and the factor also received a security interest in Non-Purchased accounts (all accounts other than Purchased Accounts), credit balances and in all other assets of the Providers, other than Avoidance Actions and Avoidance Action Recoveries, as security for any indebtedness and unsatisfied obligations of the Providers to the factor under the Post-Petition Funding Facility arising from, among other things, charge-backs, expenses and costs due by the Providers to the factor. Moreover, under the Post-Petition Funding Facility, Affinity entered into a Validity Guaranty of certain of the Providers' obligations and indebtedness due to HCRFSPC, as more fully set forth in the Validity Guaranty, and granted HCRFSPC a first priority lien on the assets of Affinity to secure its obligations as Validity Guarantor (which secured claims by HCRFSPC against Affinity in respect of the Validity Guaranty, as later assigned to

HCI, together with HCRFSPC's secured claim against the providers, also later assigned to HCI, is hereinafter referred to as the "HCI Secured Claim").

On the terms of the Exit Funding Facility Letter of Intent and the Ratification, Assumption and Amendment Agreement between the Debtors, Reorganized Debtors and HCI, dated as of the Effective Date of the Plan, pursuant to §§ 105,  363(b),1129 and 1142 of the Bankruptcy Code, the Reorganized Debtors shall assume and become parties to the Purchase Agreement and other funding documents, as amended therein, and the Post-Petition Funding Agreement shall be converted into the Exit Funding Facility under which the Reorganized Debtors shall continue to sell accounts and related conveyed property to HCI in a "true sale" from and after the Effective Date of the Plan.  In connection therewith, the HCI secured claim shall be assumed by the Reorganized Debtors and satisfied and paid under the terms of the Purchase Agreement as so amended in the Ratification, Assumption and Amendment Agreement, which is attached hereto as Exhibit 4, and incorporated herein, and as more fully described in Section 7.03 of the Plan.

3.10. **Class 3 – Secured Claim of DRS.**  DRS shall be deemed to hold a Secured Claim in the amount of $591,345.45 for pre-petition provider taxes, adjusted for all post-petition payments received by DRS, and shall receive on account of its Secured Claim equal quarterly payments over a two year period, with the first payment commencing on July 31, 2010, plus statutory interest at 12% per annum.

**3.11. Class 4 – Secured Claim of DSS.** DSS asserts that it holds a secured recoupment claim for payments made by or on behalf of DSS, pursuant to the State of Connecticut's Medicaid Program for services rendered or otherwise provided by or on behalf of any of the Debtors prior to the Petition Date (regardless of whether any costs reports with respect to such services were submitted or audited before or after the Petition Date), which reimbursements or other payments DSS contends were improperly made, were made in the wrong amount or otherwise recoverable by DSS, in the total amount of $3,998,945.00. The Secured Claim of DSS shall be satisfied in the manner provided for in the State Settlement Agreement.

**3.12. Class 5 – Secured Claim of GMAC.** GMAC shall be deemed to hold a Secured Claim in the amount of $16,571.23, adjusted for all post-petition payments received by GMAC, and shall receive on account of its Secured Claim regular monthly payments in accordance with the terms of the Retail Installment Contract by and between the Debtors and GMAC. To secure performance on the payments provided to it hereunder, GMAC shall retain its lien and/or security interest in its pre-petition collateral consisting of a 2007 Chevy Trailblazer, with the same force, effect and priorities such lien and/or security interest held pre-petition.

**3.13. Class 6 – Secured Claim of Great American.** Great American shall be deemed to hold a Secured Claim in the amount of $18,174.66, adjusted for all post-petition payments received by Great American, and shall receive on account of its

33

Secured Claim regular monthly payments in accordance with the terms of the Lease Agreement by and between the Debtors and Great American. To secure performance of the payments provided to it hereunder, Great American shall retain its lien and/or security interest in its pre-petition collateral consisting of an Inter-tel axxess 5200 Telephone System with the same force, effect and priorities such lien and/or security interest held pre-petition.

**3.14. Class 7 – Holders of Unsecured Claims.** Class 7 Claims includes all Rejection Claims and all other General Unsecured Creditors, but does not include intercompany claims, Claims of Metro, the IRS, the State, the Real Estate Entities or any other person or entities with whom there are settlements of administrative, priority non-tax, priority tax, or alleged secured claims, or whose administrative, priority non-tax, priority tax, or alleged secured claims are included in other classes or otherwise treated herein and does not include deficiency claims or the unsecured claims of shareholders and members of the Debtors, whether or not such claims are held individually or in trusts, which are being waived pursuant to Section 3.15, all of which are expressly excluded from Class 7. Each Holder of an Allowed Unsecured Claim will be entitled to receive its Pro Rata Share in cash, of an amount equaling ten (10%) percent of the total allowed Class 7 claims (the "Fund"). The Fund will be funded over a five year period from operations, and will be paid in equal quarterly installments over a five-year period commencing on July 31, 2010 provided, however, that the Creditor's

34

Committee, at its option, may direct one or more of the Distributions to be paid in accordance with Section 5.01 herein, to be directed instead to the person, entity or other vehicle designated by the Creditors Committee to prosecute the Avoidance Actions to fund the fees and expenses incurred in connection with the prosecution of such Avoidance Actions.   The installments shall be accompanied by a statement, prepared by the Creditor's Committee in conjunction with the Debtors, setting forth the calculation of the installment payment including any adjustments or reductions for the monies used for litigation expenses.   In addition, each Holder of an Allowed Unsecured Claim will be entitled to receive a Pro Rata Share of the Avoidance Action Recoveries and Unclaimed Property  Only allowed unsecured claims are entitled to distribution.  No disputed claim shall receive a distribution unless and until such claim becomes an Allowed Claim by Final Order.

    **3.15.  Class 8 -- Common Shareholder Interests.**  Class 8 Interests consist of those ownership interests in each of the five Debtors as shown Exhibit 5 attached hereto.   The Holders of the Class 8 Interests will repurchase their existing equity interests for a total capital investment of $300,000 in cash.   Additionally, Class 8 interests will facilitate funding for the Reorganized Debtors through the additional borrowings to be made by certain members of Class 8 as set forth and described in the HUD Settlement.  Further, Holders of Class 8 interests who also hold unsecured

claims against the Debtors, whether or not such claims are held individually or in trusts, will waive distribution on such claims.

## ARTICLE IV

## SOURCES OF FUNDING FOR THE PLAN

**4.01. Plan Funding.** The Plan will be funded from cash on hand, financing, the capital contribution by the Class 8 interests, future operations, and from the sale of accounts and related Conveyed Property to HCI under the Exit Funding Facility, from and after the Effective Date of the Plan.

(a) **Cash on Hand:** the Debtors expect to have approximately $115,000 cash on hand on the Effective Date generated from operations.

(b) **Capital Contribution:**

(i) Class 8 Interests will make capital contributions consisting of a combination of cash and property. As more fully set out in the HUD Settlement Agreement, HHF will loan $450,000 to Benjamin Z. Fischman to be secured by his and Samuel Strasser's interest in the Real Estate Entities. In addition, HHF will make an Operating Loss Loan to Property A in the amount of $1,250,000, which Loan will be insured by HUD under the provisions of Section 232, pursuant to 223(d)(3) of the National Housing Act, and the Regulations now in effect thereunder. The proceeds of the HHF Loan and the Operating Loss Loan will be utilized to cure the mortgage arrearages as well as pay other

36

fees necessary to enable the mortgages on Property A, Property B and Property D, to be reinstated, reassigned and restructured. Upon reassignment, the mortgages will be restructured to reduce the interest rates on the mortgages held on Property A, Property B and Property D. HUD will continue to hold the mortgage on Property E, which mortgage will also be restructured to reduce the interest rate so that the Debtors' rental payments can be commensurately reduced. The reduction in the interest rates will enable the Real Estate Entities to charge a significantly reduced rent to the Operating Entities, which will result in an annual savings of approximately $850,000. It is anticipated that there would be approximately $250,000 remaining from the proceeds of the HHF Loan to Benjamin Z. Fishman and the Operating Loss Loan to Alexandria Mann Associates, LLC, after paying the aforesaid cure amounts and fees, which monies will be loaned to the Reorganized Debtors. Said funds will be used by the Reorganized Debtors for operations. Additionally, Class 8 Interests will make an additional equity contribution of $300,000.00 in cash to the Reorganized Debtors upon confirmation of the Plan.

(c)  **Operations.**  Payments to be made under the Plan will be generated in part from operations throughout the term of the Plan.

(d)  **Exit Funding Facility.** The Ratification, Assumption and Amendment Agreement will convert the Post-Petition Funding Facility into the

Exit Funding Facility. The term of the Exit Funding Facility will be one (1) year[3],

subject to footnote 3 below and as more fully delineated in the Ratification,

Assumption and Amendment Agreement, unless earlier terminated or later

extended pursuant to its terms. Most terms and conditions of the Post-Petition

Funding Facility will continue in the Exit Funding Facility.

## ARTICLE V

## PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN

### 5.01. Timing of Distributions.

(a)    An initial Distribution of .05% of the Fund will be made to the

Holders of Allowed Claims in Class 7 on July 31, 2010. Thereafter, unless

otherwise directed by the Creditors Committee pursuant to Section 3.14,

nineteen (19) additional quarterly payments of .05% of the Fund, plus any funds

available from the Avoidance Action Recoveries, Unclaimed Property, and any

---

[3]   An initial term through December 31, 2010, plus a further committed extension, subject to the terms of the Ratification, Assumption and Amendment Agreement, to bring the total term to twelve (12) months (including the initial term aforesaid), provided that (a) the variance between (i) the actual cumulative operating cash flows for the period June 1, 2010 through December 31, 2010, as compared to the projected cash flows for such period in the latest projections provided to HCI on April 26, 2010, do not vary adversely by more than 7.5% from the latest projections so provided to HCI (provided, however, that further capital contributions by Benjamin Fischman and Sam Strasser during such period, above those shown in the projections given to HCI on April 26th, shall be treated as operating cash flow for this purpose) and (ii) the ending cash balance on December 31, 2010, as compared to the projected ending cash balance at that time in such projections, do not vary adversely by more than 5% and (b) there has been no prior or existing Event of Default, as defined in the Purchase Agreement, under the Exit Funding Facility and (c) there is no material increase (15% or more) in the amount and aging of trade payables, as to any age category (current, 30-day, 60-day, 90-day, and over 120-days), at December 31, 2010, compared to the aging and amount of trade payables on April 27, 2010.

38

funds released from the Disputed Claims Reserve, will be made to Holders of Allowed Claims in Class 7 with the last payment being due and payable on April 30, 2015. Other than the Unclaimed Property and Disputed Claims Reserve, funds from the Disputed Claims Reserve and Avoidance Action Recoveries, completion of the twenty (20) payments provided herein will be in full satisfaction, discharge, distinguishment and release of all Holders of Class 7 Claims against the Debtors and their Property. Distributions will only be made if and when the claim is allowed. Distribution of Avoidance Actions Recoveries, Unclaimed Property, and funds released from the disputed claims served, shall be made as soon as practical to the Class 7 Holders Pro Rata as addition to the scheduled Pro Rata distributions of .05% of the Fund. If the claim is not an Allowed Claim as of the applicable Distribution Date, an amount equal to the pro-rated share of what would be paid on such disputed claim if allowed, will be deposited in the Disputed Claims Reserve. If the Disputed Claim is resolved in favor of the Holder of the Claim, the funds held in the Disputed Claims Reserve attributable to that Holder's claim, shall be immediately disbursed.    If the Disputed Claim is disallowed, the proceeds will be added to the funds available for distributions to Holders of Allowed Claims.

### 5.02.  Delivery of Distributions

The Reorganized Debtors will make distributions to each Holder of an Allowed Claim at the addresses set forth on a Proof of Claim filed by the Holder or if none, then at the address set forth in the Schedules.  Except as set forth below, if any distribution is returned as undeliverable, no further distribution will be made to that Holder unless and until the Reorganized Debtors are notified in writing of that Holder's current address, at which time all missed distributions will be made to such Holder, without interest.

### 5.03.  Method of Distributions.

Any cash payment to be made pursuant to the Plan may be made by check, draft, wire transfer, or as otherwise provided for or required by any relevant agreement or applicable law, at the option of the Reorganized Debtors.

### 5.04.  Failure to Negotiate Checks or Instruments.

Checks or instruments issued in respect of distributions under the Plan shall be null and void if not negotiated within sixty (60) days after the date of mailing. Requests for reissuance of any check or instrument shall be made in writing to the Reorganized Debtors by the Holder of the Allowed Claim with respect to which such check/instrument was originally issued, and any such request shall be made within one hundred twenty (120) days after the date of mailing. Thereafter, if no such request has been made all such amounts shall be deemed Unclaimed Property in accordance

with Section 5.05 of the Plan, and all Claims in respect of such void checks and the underlying distributions shall be forever barred, estopped and enjoined from assertion in any manner against the Debtors, Reorganized Debtors and their property.

### 5.05. Unclaimed Property.

All property distributed on account of Claims must be claimed within one hundred twenty (120) days after such distribution is made to such Holder, or in the case of a check which has not been timely negotiated, a request for reissuance must be received by the Reorganized Debtors within 120 days after mailing of the check. Nothing contained in the Plan or otherwise shall require the Debtors, or the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim other than by reviewing filed Proofs of Claim and the Debtors' Schedules. Pursuant to Code Section 1143, all claims with respect to Unclaimed Property shall be deemed Disallowed and expunged and the Holder of any Claim thereby Disallowed shall be forever barred, estopped and enjoined from asserting such claim, in whole or in part, against the Debtors, Reorganized Debtors, or property of the Debtors or Reorganized Debtors. All Unclaimed Property shall automatically vest in the Fund for future distributions to Holders of Class 7 Claims.

### 5.06. Compliance with Tax Requirements.

In connection with each distribution as to which the filing of an information return is required, or withholding is required, the Debtors shall file such information

41

return with the appropriate tax authority, provide any required statements to the recipient's of such distribution, and effect any such withholding and deposit all monies so withheld as required by law. With respect to any Person from whom a tax identification number or other information is required to avoid withholding, if such information is not received by the Debtors within thirty days after a request therefor, then the Debtors may, at its option, decline to make any distribution until the information is provided, or, withhold the amount required and distribute the balance of the Distribution to the Holder.

**5.07. De Minimis Distributions.** No distribution of less that $10.00 shall be made to any Holder of a Claim.

**5.08. Setoff and Recoupment**. The Debtors may, but shall not be required to, set off or recoup against any Claims and the payments or distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities and claims of every type and nature which the Debtors may have against the Holder of a Claim, but neither the failure to exercise the right of setoff or recoupment nor the allowance of any such Claims, whether pursuant to the Plan or otherwise, shall constitute a waiver or release by the Debtors of any claims, rights or remedies, and all of same shall be retained and revested in Reorganized Debtors, except as otherwise provided for in or if inconsistent with other terms of this Plan.